No. 2019-2024

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

PYROTECHNIC SPECIALTIES, INC.,
*Appellant*,

v.

SECRETARY OF DEFENSE,
*Appellee*.

Appeal from the Armed Services Board of Contract Appeals
ASBCA Nos. 57890, 58335, 59103
Reba Page, Mark Stempler, and Richard Shackleford, Administrative Judges

BRIEF OF APPELLEE SECRETARY OF DEFENSE

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

PATRICIA M. MCCARTHY
Assistant Director

DANIEL S. HERZFELD
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
PO Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-0344
Email:  daniel.s.herzfeld@usdoj.gov

April 20, 2020                    *Attorneys for Appellee*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ................................................ viii

STATEMENT OF THE ISSUES ...........................................................1

STATEMENT OF THE CASE SETTING FORTH THE RELEVANT
FACTS ...................................................................................................2

I.    NATURE OF THE CASE AND PROCEEDINGS BELOW ........................2

II.   STATEMENT OF FACTS ...........................................................2

    A.    PSI Performs With Occasional Quality Control Issues
         During Interfixes 1 Through 3 ................................................9

    B.    Interfix 4, Failure of FATs, And Cure Notice....................16

    C.    The Army Terminates The Contract For Default Because
         PSI Failed To Timely Perform When Lots 4-2 and 4-3
         Fail Critical And Major Characteristics Tests During LATs............. 19

SUMMARY OF ARGUMENT ..............................................................23

ARGUMENT ........................................................................................25

I.    STANDARD OF REVIEW .........................................................25

II.   THE BOARD'S DECISION SUSTAINING THE DEFAULT
    TERMINATION IS SUPPORTED BY SUSTANTIAL EVIDENCE .........26

    A.    The Default Termination Was Justified ..............................27

B.    PSI Failed To Prove That Its Default Should Be Excused .................29

    1.    The Board's Finding That PSI Had Failed To Prove That The Army's Specifications Were Defective Is Supported By Substantial Evidence ...........................................................30

    2.    The Board's Finding That The Army Did Not Abuse Its Discretion In Terminating The Contract For Default Is Supported By Substantial Evidence ....................................36

        a.    The Standard For Abuse Of Discretion In Terminations .................................................................36

        b.    The Board's Finding Of No Abuse Of Discretion Is Supported By Substantial Evidence ..........................41

    3.    The Board's Finding That PSI Failed To Meet Its High Burden To Establish Bad Faith Is Supported By Substantial Evidence ...........................................................46

III.    PSI HAS FAILED TO ESTABLISH THAT THE BOARD ABUSED ITS DISCRETION IN RULING ON EVIDENTIARY OBJECTIONS .......53

CONCLUSION ....................................................................................60

# TABLE OF AUTHORITIES

<u>Cases</u>

*Am-Pro Protective Agency v. United States*,
    281 F.3d 1234 (Fed. Cir. 2002) ............................................................47

*Copeland v. Veneman*,
    350 F.3d 1230 (Fed. Cir. 2003) ................................................... 26, 29

*Darwin Constr. Co. v. United States*,
    811 F.2d 593 (Fed. Cir. 1987) ............................................................39

*DCX, Inc. v. Perry*,
    79 F.3d 132 (Fed. Cir. 1996) ..............................................................42

*Delfasco LLC*,
    ASBCA No. 59153, 17-1 BCA ¶ 36659 ...............................................43

*Empire Energy Mgmt. Sys., Inc. v. Roche*,
    362 F.3d 1343 (Fed. Cir. 2004) ................................................... 25, 41

*Gen. Dynamics Corp. v. Panetta*,
    714 F.3d 1375 (Fed. Cir. 2013) ................................................... 25, 26

*Gen. Injectables & Vaccines, Inc. v. Gates*,
    519 F.3d 1360 (Fed. Cir.), *modified denying reh'g*,
    527 F.3d 1375 (Fed. Cir. 2008) ........................................... 26, 27, 29

*Gen. Injectables & Vaccines, Inc. v. Gates*,
    527 F.3d 1375 (Fed. Cir. 2008) ..........................................................52

*GLR Constructors, Inc.*,
    ENGBCA No. 6128, 96-1 BCA ¶ 28,218 (1996)
    *aff'd*, 114 F.3d 1206 (Fed. Cir. 1997) ...............................................36

*Jet Constr. Co. v. United States*,
   531 F.2d 538 (Ct. Cl. 1976) ................................................................30

*John A. Johnson Contracting Corp. v. United States*,
   132 F. Supp. 698 (Ct. Cl. 1955) ........................................................39

*Johnson Mgmt. Grp. CFC, Inc. v. Martinez*,
   308 F.3d 1245 (Fed. Cir. 2002) .........................................................54

*Kihlberg v. United States*,
   97 U.S. 398 (1878) .............................................................................38

*Krygoski Constr. Co. v. United States*,
   94 F.3d 1537 (Fed. Cir. 1996) ...........................................................46

*McDonnell Douglas Corp. v. United States*,
   182 F.3d 1319 (Fed. Cir. 1999) ........................................ 37, 39, 40, 41

*Nat'l Presto Indus., Inc. v. West Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996) ...........................................................54

*Phoenix Data Solutions LLC*,
   ASBCA No. 60207, 18-1 BCA ¶ 37,164 ...........................................56

*Precision Specialties, Inc.*,
   ASBCA No. 48717, 96-1 BCA ¶ 28,054 ...........................................39

*Pyrotechnic Specialties, Inc.*,
   ASBCA Nos. 57890 *et al.*, 17-1 BCA ¶ 36,696 ............................... 2, 23

*Pyrotechnic Specialties, Inc.*,
   ASBCA Nos. 57890 *et al.*, 19-1 BCA ¶ 37,304 ............................... 2, 23

*Radiation Tech., Inc. v. United States*,
   366 F.2d 1003 (Ct. Cl. 1966) ..............................................................31

*Road & Highway Builders, LLC v. United States*,
   702 F.3d 1365 (Fed. Cir. 2012) ..................................................... 46, 47

*Schlesinger v. United States*,
   390 F.2d 702 (Ct. Cl. 1968)........................................................... 39, 40

*Securiforce Int'l Am., LLC v. United States*,
   125 Fed. Cl. 749 (2016), *aff'd-in-part and vacated-in-part on other grounds*,
   879 F.3d 1354 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 478 (2018) .................46

*TEG-Paradigm Envtl., Inc. v. United States*,
   465 F.3d 1329 (Fed. Cir. 2006) .........................................................30

*U.S. Fid. & Guar. Co. v. United States*,
   676 F.2d 622 (Ct. Cl. 1982)..................................................... 38, 40, 46

*United States v. Wunderlich*,
   342 U.S. 98 (1951) ..........................................................................38

*White v. Edsall Constr. Co.*,
   296 F.3d 1081 (Fed. Cir. 2002) .........................................................30

Statutes

5 U.S.C. § 706................................................................................ 36, 37

41 U.S.C. § 321 (2006) .......................................................................39

41 U.S.C. § 322 (2006) .......................................................................39

41 U.S.C. § 7103 .......................................................................... 37, 39

41 U.S.C. § 7104 .......................................................................... 37, 39

41 U.S.C. § 7107 .......................................................................... 25, 26

Pub. L. No. 111-350, 124 Stat. 3677 (Jan. 4, 2011) ...............................39

Rules & Regulations

48 C.F.R. § 43.103 ................................................................................... 51

48 C.F.R. § 49.402-3 ................................................................... 22, 42, 43

48 C.F.R. § 49.402-5 ................................................................................22

48 C.F.R. § 52.246-2 .................................................................................5

48 C.F.R. § 52.249-8 ................................................................ 7, 26, 27, 43

Fed. R. Civ. P. 32 ....................................................................................56

Fed. R. Evid. 611(b) ................................................................................58

ASBCA R. 8, 48 C.F.R. Ch. 2, Appx A ........................................... 55, 56

ASBCA R. 10, 48 C.F.R. Ch. 2, Appx A ............................................... 58

# **LIST OF ACRONYMS USED**

Administrative Procedure Act (APA)

Contract Disputes Act (CDA)

Defense Contract Management Agency (DCMA)

Federal Acquisition Regulation (FAR)

First Article Test (FAT)

Lot Acceptance Test (LAT)

Quality Assurance Representative (QAR)

Request for Deviation (RFD)

## **<u>STATEMENT OF RELATED CASES</u>**

Pursuant to Fed. Cir. R. 47.5, appellee's counsel is unaware of any other appeals taken from the same proceedings before the Armed Services Board of Contract Appeals to this Court or any other appellate court. Also, counsel is unaware of any cases that will directly affect or be directly affected by this Court's decision in this appeal.

No. 2019-2024

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

PYROTECHNIC SPECIALTIES, INC.
*Appellant,*

v.

SECRETARY OF DEFENSE,
*Appellee.*


Appeal From The Armed Services Board Of Contract Appeals
ASBCA Nos. 57890, 58335, 59103,
Reba Page, Mark Stempler, and Richard Shackleford, Administrative Judges

## BRIEF FOR APPELLEE

## STATEMENT OF THE ISSUES

1.      Whether the decision of the Armed Services Board of Contract

Appeals (ASBCA or board) sustaining the default termination of the Department of

the Army's (Army) contract with Pyrotechnic Specialties, Inc. (PSI) is supported

by substantial evidence.

2.      Whether the board abused its discretion in limiting some testimony

based on foundation, hearsay, and other evidentiary rules.

# STATEMENT OF THE CASE
## SETTING FORTH THE RELEVANT FACTS

## I.    NATURE OF THE CASE AND PROCEEDINGS BELOW

PSI appeals the board's decision sustaining the Army's default termination of PSI's contract to produce MK 124 signals.  Appx1.[1]  *Pyrotechnic Specialties, Inc.*, ASBCA Nos. 57890, 58335, 59103, 17-1 BCA ¶ 36,696, at 178,692-93 (Appx66-68).  Subsequently, the board denied PSI's request for reconsideration.  *Pyrotechnic Specialties, Inc.*, ASBCA Nos. 57890 *et al.*, 19-1 BCA ¶ 37,304 (Appx3131-3143).

## II.    STATEMENT OF FACTS

On September 27, 2004, the Army awarded contract number W52P1J-04-C-0098 (the contract) to PSI to supply 60,558 units of the MK124 Mod 0 Signal, Smoke & Illumination (MK 124 or signal) – later modified to increase the total quantity to 152,180 signals.  Appx1-2.  The MK 124 is a distress signal used by all the services that allows military personnel to signal reconnaissance aircraft.  Appx2; Appx559.  The Navy originally designed the signal for when a service

---

[1]  PSI does not appeal the board's denial of its appeals regarding its affirmative claims.  PSI's opening brief challenges only the board's decision sustaining the default termination.  Accordingly, PSI has waived any challenges to the denial of its affirmative claims in ASBCA Nos. 58335, 59103.  PSI also mentions that the Army sought reimbursement from PSI for unliquidated progress payments of $1,433,315.42.  Appellant's Opening Brief at 10 (ECF No. 18).  However, PSI never filed a claim for the unliquidated progress payments and that issue was never before the board and is not before this Court.

-2-

member fell overboard or to allow a downed pilot to signal for help. Appx2;
Appx570.

The MK 124 signal is a 5.408 inch-long tube with a 1.700 inch diameter,
weighs approximately a half pound, and includes two subassemblies, with a flare
candle subassembly at one end of the tube that will produce a red flare when
triggered (for use at night) and a smoke candle subassembly at the other end of the
tube, which produces a reddish, orange smoke when triggered (for use during the
day). Appx6; Appx1106, Appx1115. The specification includes the following
drawing of the MK 124:



Appx1666. An Army website includes a picture of the completed MK 124 signal,
for reference:



A foil sealing disk sits at the end of each of the two candle subassemblies between their respective igniters.  Appx6; Appx570-571.  The sealing disk is used to create a "hermetic waterproof seal" at each end of the canister so that the candles stay dry and to keep in heat to assist in igniting the candles when triggered.  Appx6; Appx571.  Each sealing disk is secured by a rubber O-ring placed around the circumference of the igniter on each end of the canister.  Appx7.  The canister is then crimped and the O-ring and crimp together seal the unit.  Appx7.

Although the Army awarded the contract, the contract contained contract line items designating signals for Army, Navy, and Air Force customers.  Appx1; Appx1010-1015.  The Army supplied the contracting officer for the contract; the Defense Contract Management Agency (DCMA) supplied Quality Assurance Representatives (QARs), who were responsible for issuing Corrective Action Requests; and the Navy provided personnel to oversee the specifications (which had originated with the Navy).  Appx1-2.

---

<sup>2</sup>

https://www.pica.army.mil/pmccs/SupportMunitions/_images/Mk124_big.jpg (visited on March 19, 2020).

-4-

The contract incorporated several clauses pertinent to PSI's performance

obligations when conducting tests of the MK 124 signal prior to acceptance by the

Army.

The contract incorporated by reference the Federal Acquisition Regulation's

(FAR) Inspection of Supplies – Fixed-Price clause (48 C.F.R.

§ 52.246-2), which provides that the

> Contractor shall provide and maintain an inspection
> system acceptable to the Government covering supplies
> under this contract and shall tender to the Government
> for acceptance only supplies that have been inspected in
> accordance with the inspection system and have been
> found by the Contractor to be in conformity with contract
> requirements . . . .

Appx1026; 48 C.F.R. § 52.246-2(b).  The clause provides that "the Government

has the right either to reject or to require correction of nonconforming supplies,"

which are supplies "defective in material or workmanship or otherwise not in

conformity with contract requirements."  48 C.F.R. § 52.246-2(f).  Also, as to

quality control, the contract incorporated the Higher-Level Contract Quality

Requirement clause (52.246-11), which required PSI to follow ISO 9001-2000

quality control standards.  Appx1028.

The contract incorporated the First Article Test clause (52.209-4511), which

required PSI to provide a "first article" to be "examined and tested in accordance

with contract requirements, the item specification(s), the Quality Assurance

Provisions (QAPS) and drawings listed in the Technical Data Package."
Appx1026. The clause provides that the first article must be produced "using the
technical data package provided by the Government." Appx1026. The contracting
officer may order a new first article test (FAT) when "(i) a major change is made
to the technical data, (ii) whenever there is a lapse in production for a period in
excess of 90 days, or (iii) whenever a change occurs in the place of performance,
manufacturing process, material used, drawing, specification or source of supply."
Appx1026; Appx3.

The contract also incorporated the Submission of Production Lot Samples
clause (52.246-4530), which states, "A lot acceptance test is required to be
submitted by the contractor from each production lot tendered to the Government
for acceptance." Appx1030; Appx3-4. The sample was required to conform to the
MK 124 specifications incorporated in the contract. Appx1030; Appx4. If PSI
failed to deliver lot samples within the agreed-upon contractual times or "if the
Contracting Officer disapproves any production lot test sample(s), the Contractor
shall be deemed to have failed to make delivery within the meaning of the Default
clause of this contract. Therefore, this contract may be subject to termination for
default." Appx1031; Appx4.

The contract also incorporated the Critical Characteristics clause (52.246-
4550), which stated that the technical data package "may refer to Critical . . . and

-6-

Special characteristics."  Appx1032.  A critical nonconformance would occur if, among other reasons, the nonconformance results in a hazardous or unsafe condition for users or prevents the tactical function of a major end item. Appx1033; Appx4-5.  If a critical nonconformance were found, then PSI would be required to immediately stop production, conduct an investigation to determine the cause of the deficiency, submit a report of the investigation to the Government with suggested corrective action, and then request a restart of the production. Appx5; Appx1033.

The contract also incorporated by reference the Default (Fixed-Price Supply and Service) clause, which provides that the Government may terminate the contract if "the Contractor fails to (i) [d]eliver the supplies or to perform the services within the time specified in the contract or any extension; (ii) [m]ake progress, so as to endanger performance of this contract . . .; or (iii) [p]erform any of the other provisions of this contract . . . ."  48 C.F.R. §§ 52.249-8(a)(1)(i) – (iii); Appx1041 (incorporating this Default clause by reference in the contract).

The contract's specifications included the technical data package for the MK 124, which controls the design, production, and testing of the signal.  Appx6; Appx1104.  Consistent with the Critical Characteristics clause, characteristics of the signal were "classified as Critical, Major and Minor" for inspections and testing.  Appx1106.  "Critical characteristics are identified by the symbol (C), and

Major characteristics by the symbol (M)." Appx1106. A critical characteristic failure risked life or limb and a major characteristic failure risked successful completion of the mission. Appx574. The contract required that the lot samples meet the specifications and ignite from both ends, display the correct color, and have the proper minimum and maximum display times for the smoke or flare function. Appx1107. The specifications required the sample signals for lot acceptance tests (LAT) and FATs to undergo up to eight tests, each of which was listed as either Critical or Major: (1) five-foot drop test; (2) 40-foot drop test; (3) transportation & vibration test; (4) temperature & humidity test; (5) high temperature test; (6) low temperature test; (7) sealing integrity test; and (8) x-ray test. Appx1107-1108; Appx1113-1114. For each test, the specifications stated how many failures were permissible from a sample lot before the Army would reject the lot or FAT, stating that one signal's failure was sufficient to reject the lot for many of the tests. Appx1111-1112 (discussing for most characteristics it is "Ac 0 Rej 1," which means accept the lot with no failures, reject the lot with one failure).

As pertinent to this appeal, the sealing test required submersion of samples into a water vacuum tank. Appx8; Appx1114. A defective unit was to be labeled a leaker: "Leakers are indicated by air bubbles issuing from the signal." Appx1114; Appx8; Appx569. A leaker usually results from defective manufacture of the

signal, including a tear in the foil sealing disk or improper crimping around the O-ring.  Appx569.  As noted above, the signal must be able to perform in water conditions, given that its main purpose is to act as a distress signal for men overboard or downed pilots who are in the sea.  Appx570; Appx2.

## A.    PSI Performs With Occasional Quality Control Issues During Interfixes 1 Through 3

PSI encountered quality control problems while producing MK 124s.  PSI's production of MK 124s resulted in four "interfixes" – which identified four points when production was restarted after work had stopped because of a critical characteristic failure in production or because of a major change to the manufacture of the signals.  Appx16.  During each of the interfixes, PSI produced several lots of signals, and the parties referred to lots by interfix number and lot number – for example, Interfix 1, lot one is simply referred to as Lot 1-1.  Appx16-17.[3]  Although PSI contended that the technical data package was defective, the record before the board demonstrated that PSI's quality control problems resulted in defective signals.

Before the Army had awarded the MK 124 contract to PSI, Martin Electronics had performed multiple contracts for the Army producing over one million MK 124 signals using the same technical data package in the contract.

---

[3]  Like the board, we remove the two zeros before each interfix and lot number, such as Lot 001-001.  Appx17 n.8.

Appx668-669; Appx15.  An engineer from the Naval Surface War Center, Kevin Bowen, oversaw the technical data package and observed most of the FATs and LATs for both Martin Electronics' and PSI's contracts.  Appx636-637; Appx668; Appx582; Appx15.  Based on his years of experience with the technical data package and seeing both contractors perform, Mr. Bowen concluded there was no problem with the technical data package, but rather any issues had resulted from PSI's "quality control and other glitches hitting" PSI during production.  Appx669.

*Interfix 1*:  During the first interfix of production, PSI needed three attempts to pass the FAT.  Appx638.  After PSI passed the FAT, PSI produced 11 lots.  Lot 1-1 failed the LAT because of "leakers" – *i.e.* sample signals leaked after testing.  PSI's subcontractor had improperly prepared certain materials for PSI, causing PSI to have difficulty crimping around the O-ring.  Appx17; Appx638-639; Appx672-673.  The Army rejected Lot 1-1.

Lot 1-2 failed its LAT due to long smoke display times beyond the 19 seconds permitted by the contract's specifications for the sealing function test, with some lasting as long as 31 seconds.  Appx17; Appx640.  The Army approved PSI's request for deviation from the smoke display times for this lot and the Army accepted it on deviation, with Mr. Bowen telling PSI that around 30 seconds was the working maximum for smoke display times.  Appx17; Appx640-641.  Lot 1-3 passed all inspections, and the Army accepted it.  Appx17; Appx641.

Lot 1-4 failed due to long smoke display times (like Lot 1-2), with the longest display time of 22 seconds.  Appx18.  After that test, PSI and the Army agreed to a deviation (Request for Deviation 13 (RFD 13)) to permit acceptance of signals with smoke display times of up to 25 seconds on the sealing test (increased from the 19 seconds in the specifications).  Appx18-19; Appx1338-1340.  The contract's testing specifications stated that the maximum permitted smoke display times would vary depending on the specific test; varying from 18 seconds for the high temperature test, 19 seconds for the five-foot drop, transportation and vibration, and sealing function tests,  22 seconds for the temperature and humidity test, and 25 seconds for the low temperature test.  Appx1107; Appx7-8.  For much of the contract, the parties treated RFD 13 as increasing the maximum smoke display times for all tests to 25 seconds.  The Army accepted Lot 1-4.

Thereafter, Lot 1-5 and Lot 1-9 passed all inspections and the Army accepted each lot.  Appx19-20; Appx642-643, Appx647.  However, Lot 1-6 and Lot 1-8 had several signals that exceeded the 25 second smoke display time (one display time as high as 34 seconds), which the Army accepted after PSI had requested deviations for these lots.  Appx19-20; Appx643, Appx647.  Lot 1-7 failed the initial LAT based on tight trigger assemblies – *i.e.* the signals could not be triggered by a thumb or forefinger.  Appx20; Appx644-645.  The Army attributed this to PSI's "workmanship issue."  Appx20; Appx646.  PSI culled

through the lot, eliminated non-conforming signals, and submitted a reduced number of signals for the lot, which the Army accepted after a second LAT. Appx20; Appx645-646.

For Lots 1-2 through 1-9, none of the lots had leakers during the sealing tests.  Appx21; Appx648.  The LAT for Lot 1-10 revealed multiple leakers (and long ignition times – the time between triggering signal and when it smokes or flares).  Appx21; Appx648-649.  The Army rejected Lot 1-10.  Appx21.  PSI stopped further production, but submitted signals already produced as Lot 1-11 for a LAT, which failed due to leakers, and the Army rejected Lot 1-11.  Appx21; Appx649.

*Interfix 2*:  After the failures of Lots 1-10 and 1-11 due to leakers during the sealing tests, PSI identified the 3M 433L sealing disk as the root cause of the problem.  Appx21-22.  To qualify a new disk, PSI tested several sealing disks under FAT standards before a Government witness and concluded that it would substitute 3M's 363L sealing disk (which was thicker, but used the same adhesive material as the 3M 433L disk).  Appx585-589; Appx22.  PSI requested and received a deviation to use a thicker sealing disk (although not specifically the 3M 363L disk).  Appx22-24; Appx629-630; Appx1429, Appx1456.

Using the 3M 363L disk, PSI submitted Lots 2-1 and 2-2 for LATs at the same time.  Appx24.  Both lots failed the critical characteristic temperature and

humidity test, with 10 of 20 samples in Lot 2-1 failing and 13 of 20 samples in Lot 2-2 failing. Appx24; Appx1108. Also, several trigger assemblies fell off after testing, but the Government concluded these were "minor" defects because the failures had occurred after (and not during) testing. Appx25-26; Appx610-611. Lot 2-3 failed its LAT based on short burn times, which was a result of lost calibration control of the press operation used to manufacture the flare – *i.e.* a manufacturing error. Appx652; Appx26. Despite the failures, the Army accepted Lots 2-1, 2-2, and 2-3 under "Condition Code B," which meant that the signals were for restricted use such as for training purposes or for use in areas above a certain temperature. Appx26; Appx15 n.4; Appx653.

After Lot 2-3 failed the LAT, the Army issued a stop work order, which it later lifted after the parties settled PSI's request for equitable adjustment seeking payment for Lot 2-3. Appx26.

*Interfix 3*: After the stop work order, PSI restarted production (again using the 3M 363L disk), and Lot 3-1 passed the FAT. Appx26-27. Lot 3-2 had one leaker during the seal integrity test, the Army initially rejected it because the acceptance criteria required rejection with one failure. Appx27; Appx1111; Appx654. However, PSI requested a deviation to standard procedure to allow PSI to screen 100 percent of Lot 3-2 with a Government witness – a time consuming process that required 80-plus hours to screen the lot. Appx654-656; Appx27-28.

-13-

The Army accepted PSI's requested deviation in exchange for obtaining additional signal units and, after the screening procedure, the Army accepted Lot 3-2. Appx28.

Lot 3-3 failed the LAT and the Army rejected the lot because one signal had a critical defect during a function test when a signal "blew apart" scattering parts of the signal 141 feet from the test location. Appx617; Appx2232; Appx28. Four additional signals separated during function (but without blowing apart). Appx2345-2346; Appx28. Consistent with the Critical Characteristics clause, PSI stopped production, DCMA issued a corrective action request, and in response PSI determined that poor crimping of the flare end was the sole cause of the defective signals– *i.e.* a manufacturing error. Appx28; Appx2352-2355.

PSI requested and received approval to re-work Lot 3-3 by re-crimping the lot – referred to now as Lot 3-3A. Appx28-29; Appx2351. However, PSI used a torqueing test in an attempt to prove that the re-crimping was proper, but DCMA warned PSI that the test was not in the MK 124 specifications, was not approved, and PSI used the test at its own risk because the unnecessary torque test could result in breaking the seal to create leakers. Appx29-34; Appx2252-2254; Appx605-606; Appx710. PSI claimed its torque test proved it had properly crimped Lot 3-3A, but the board found insufficient proof that the lot had been properly crimped. Appx34. During the LAT for Lot 3-3A, one signal failed the

sealing test and another signal had its flare igniter assembly separate during function (the same critical function defect as in Lot 3-3).  Appx31; Appx2248-2249.

On March 29, 2010, DCMA rejected the lot and invoked the Critical Characteristics clause, including requesting a corrective action response from PSI and stopping production.  *Id.*  On April 13, 2010, PSI requested a deviation for Lot 3-3A, but the Army disapproved the request on May 13, 2010.  Appx2261; Appx34.  After the Government continued to request a root cause of the problem, PSI eventually concluded that the thickness of 3M 363L sealing disk was the cause of the defects in Lot 3-3A because it kept the signals from crimping properly.  Appx34-36; Appx1592-1593.  On January 28, 2011, PSI submitted a schedule to re-start production, conditioned on its request that the Government permit PSI to qualify and use the 3M 433 foil sealing disk to manufacture the MK 124 signals.  Appx36; Appx1592.  The 3M 433 sealing disk is virtually identical to the 3M 433L sealing disk used during Interfix 1, except the 3M 433 sealing disk has slightly higher adhesion strength and a different adhesive backing material.  Appx36-37; Appx589-590; Appx592-593.  DCMA rejected PSI's root cause analysis from its test data:  "The test data as presented appears to show more of a quality deficiency with the production line than a sealing disc issue."  Appx1635; Appx1640; Appx37.

On February 11, 2011, the Army responded to PSI, requesting PSI provide an updated schedule for re-starting production and a new FAT (although the Army stated it agreed with DCMA regarding the root cause problems of Lot 3-3A). Appx1639-1640; Appx37-38.  Because production had lapsed for more than 90 days, the First Article Test clause required a new FAT of the signals.  Appx1589-1590; Appx1639-1640.  After Government and PSI representatives met to discuss re-starting production consistent with correcting the prior problems, the parties bilaterally modified the contract to update the schedule, including conducting a new FAT in April 2011.  Appx38-40.  Consistent with PSI's condition of restarting the production, PSI used the 3M 433 disk for Interfix 4.  Appx40; Appx589.

### B.    Interfix 4, Failure of FATs, And Cure Notice

PSI conducted and failed the FAT for Interfix 4 that took place in April 2011.  Appx41.  In particular, 42 units leaked and failed the sealing test, 21 units failed the transportation and vibration test because they leaked, and three units failed the five-foot drop test because they leaked.  Appx41; Appx1810-1811.  PSI asserted the leaks were caused by crimping the signals at a higher pressure than normal and requested a modified FAT with fewer samples (60 rather than the normal 185 samples for a FAT).  Appx41-44; Appx1805.

The Army permitted the modified FAT, which occurred on June 13, 2011. Appx43.  PSI's modified FAT failed because:  (1) two smoke end units out of 20

were "Duds" that failed to function during the transportation and vibration test and the high temperature test and the contract required rejection if two failed in a test; (2) 10 smoke end units out of 20 tested exceeded the three-second delay time in the cold test and the contract required rejection if three failed the test; and (3) nine smoke end units out of 20 tested exceeded the 25-second maximum display time, with the longest lasting 28 seconds, and the contract required rejection if three failed this test.  Appx1963-1964; Appx45; Appx1991; Appx46-47.

On June 29, 2011, the Army issued a cure notice to PSI because it had failed two consecutive FATs and those failures endangered performance of the contract. Appx1985; Appx46.  The Army requested that PSI respond in 10 days with a plan regarding how and when the problems would be cured.  *Id.*

On July 11, 2011, PSI responded with a proposed cure regarding the defects in the modified FAT.  Appx1991-1993.  It stated that the primary problem regarding the duds was the age of the ignition disks and that tests using the new ignition disks did not face the same problems.  Appx46; Appx1991.  PSI stated that the smoking issues related to a bad batch of smoke candles, which it stated it would not use in future units.  Appx46-47; Appx1991-1993.  PSI proposed a schedule to test and deliver the lots for Interfix 4.  Appx47; Appx1993.

After the Army and PSI exchanged additional correspondence discussing the Army's concerns and a schedule for completing the lots for Interfix 4, the parties agreed to the following schedule proposed by PSI:

|       | Quantity | Production Complete | Lot Acceptance Test Date | Acceptance Date |
|-------|----------|---------------------|--------------------------|-----------------|
| Lot 1 | 5,400    | 8/5/2011            | 8/9/2011 – 8/11/2011     | 8/17/2011       |
| Lot 2 | 9,416    | 8/19/2011           | 8/23/2011 – 8/25/2011    | 8/31/2011       |
| Lot 3 | 7,712    | 9/2/2011            | 9/6/2011 – 9/8/2011      | 9/14/2011       |
| Lot 4 | 10,000   | 1/13/2012           | 1/17/2012 – 1/19/2012    | 1/25/2012       |
| Lot 5 | 10,000   | 3/2/2012            | 3/6/2012 – 3/8/2012      | 3/14/2012       |
| Lot 6 | 5,397    | 4/13/2012           | 4/10/2012 – 4/12/2012    | 4/18/2012       |

Appx2000-2003; Appx49.  The parties bilaterally modified the contract to revise the delivery schedule and the Army agreed to permit PSI to conduct a joint FAT and LAT together for Lot 4-1.  Appx2027-2038; Appx49.

Consistent with the new schedule, PSI conducted the joint FAT and LAT during the week of August 8, 2011.  Appx50.  Lot 4-1 failed these tests due to long smoke display times beyond 25 seconds and PSI requested the Army accept the lot on deviation.  Appx50; Appx2065-2066.  On August 25, 2011, the Army approved the request for deviation and accepted Lot 4-1.  Appx2065-2066; Appx51.

At the same time, PSI again requested that the Army change the delivery schedule, including, among other things, at first proposing a reduction to the quantity of signals for Lot 4-2 by 4,000 units, terminate the remainder of units for Lot 4-2 for convenience (and increasing the number of units for Lots 4-3 and 4-6).

Appx51-52.  Later, PSI proposed reducing the number of units for Lots 4-3 and 4-6 rather than Lot 4-2.  Appx51-52.  Although discussed, the parties never modified the contract.  Appx52; Appx891-892.

### C.    The Army Terminates The Contract For Default Because PSI Failed To Timely Perform When Lots 4-2 and 4-3 Fail Critical And Major Characteristics Tests During LATs

On August 29, 2011, PSI submitted Lot 4-2 for a LAT at PSI's facilities. Appx52.  This lot failed several critical or major characteristics tests required for acceptance and there were several test quality issues.  Appx52-55; Appx2083-2106.

One signal (sample number 40) of 135 failed the sealing integrity test, a major characteristic failure.  Appx53; Appx2087; Appx1108 ("Sealing (M105)"). The contract's acceptance criteria stated that the Army would reject the lot for one failure (and accept only with none).  Appx1111; Appx13, Appx53.  While PSI later conducted another "informational" sealing test, this signal had already failed this major characteristics sealing test.  Appx53; Appx2087.

One signal, sample number 109, of 20 signals tested, failed the transportation and vibration sealing test, a critical characteristic under the contract's specifications.  Appx53; Appx2087; Appx1108 ("Transportation vibration (C4)").  The contract's acceptance criteria stated that the Army would reject the lot for one failure (and only accept with no failures).  Appx1111;

Appx13.  The QAR, Dean Cowart, identified several "disparities" in how PSI

conducted this test, including that PSI removed sample number 109 to take pictures

(even though testing samples were never to leave the Government's control during

testing), PSI inadvertently repeated a test twice, PSI removed the transportation

vibration rounds from their casing without Government oversight, and removed the

same samples from soaking contrary to Government instruction and without

Government oversight.  Appx53-54; Appx2101 ("PSI employees continue to

misunderstand the importance of following directions.").

Additionally, Lot 4-2 failed several smoke tests by exceeding the display

times for smoking, including 19 of 20 failures for the low temperature test, 3 of 20

for the high temperature test, and 4 of 20 for the five-foot drop test.  Appx2088;

Appx2101; Appx54.  On September 2, 2011, DCMA rejected Lot 4-2.  Appx2101;

Appx54.

On September 9, 2011, the Army issued a show cause notice to PSI stating

that PSI had "failed to deliver acceptable product in accordance with the delivery

schedule for" the contract, which required delivery of 9,416 MK 124s by August

31, 2011, "placing this contract in a delinquent status."  Appx2108; Appx55.

"DCMA has rejected the applicable lot due to several quality-related failures

encountered during the Lot Acceptance Test (LAT)."  Appx2108.  The Army also

noted the June 29, 2011 cure notice had previously found "conditions endangering

performance" and PSI failed to meet its own schedule proposed to remedy that prior cure notice. Appx2108. The Army stated it was considering termination for default because of PSI's failure to timely perform and requested PSI respond within 10 days to provide any excuses for PSI's failure to perform. Appx2108-2109.

On September 12, 2011 – three days after the show cause letter – PSI submitted Lot 4-3, which PSI tested that week. Appx56. After a visual review of the sample lot during the LAT, the QAR found that three of the signals had a critical defect because the alignment pin of the igniter was not in the alignment pin hole of the smoke primer and holder – a failure of a critical requirement in the specifications (Appx1666). Appx3033; Appx56; Appx2111. Lot 4-3 (like Lot 4-2) failed the sealing test, because one of 20 samples leaked – a major characteristic failure. Appx3034; Appx56. Also, like Lot 4-2, Lot 4-3 also had long smoke display times under several tests. Appx3034-3035; Appx56. After DCMA issued a request for a corrective action report for the alignment pin defect, PSI responded by concluding that it occurred "[d]uring the crimping process," which resulted in the misalignment of the pin with the igniter. Appx56; Appx2111.

On September 14, 2011, PSI responded to the Army's show cause letter regarding Lot 4-2. Appx2115-2116. PSI stated that it was "optimistic" that the Army would grant a deviation regarding the long smoke times based on a meeting

with the "government team."  Appx2115; Appx57.  PSI provided three excuses,

which all related to the old sealing disk that had been resolved in March 2011:

(1) the technical data package was defective because it relied on the 3M 363L

sealing disk; (2) PSI had successfully resolved the problem with the sealing disk by

gaining approval to use the 3M 433 sealing disk, which was introduced into

production in July 2011; and (3) PSI's delay was due to the time it took to qualify

to use the replacement 3M 433L sealing disk.  Appx2115-2116; Appx57.  As the

board found, "PSI's response did not provide any excuses for the delays that

occurred after the delivery schedule was modified in July 2011."  Appx57.

Consistent with the requirements of the FAR (48 C.F.R. §§ 49.402-5 &

49.402-3(f) & (g)), the contracting officer prepared a memorandum dated

September 21, 2011, which outlined the basis for termination.  Appx57;

Appx2123-2124.

The Navy disagreed that the Army should terminate, although the Coast

Guard and Air Force both concurred with the Army.  Appx861-862; Appx3079.

The contracting officer considered the Navy's position that it would be less costly

to continue to work with PSI to remedy Lots 4-2 and 4-3 rather than terminate.

Appx3079; Appx861-862.  But, the Navy did not disagree with the basis of the

termination.  Appx861; Appx3079.  On September 26, 2011, the Army terminated

the contract for default.  Appx2131-2137.

PSI filed appeals with the ASBCA under the Contract Disputes Act (CDA), including the Army's decision to terminate for default PSI's contract to produce MK 124 signals and the Army's denial of PSI's claims for costs of a rejected lot of MK 124 signals.  Appx1.  The board held a hearing and concluded that the Army had established a *prima facie* case justifying the default termination because PSI had failed to timely deliver two lots of MK 124 signals.  Appx67-68; *Pyrotechnic Specialties, Inc.*, ASBCA Nos. 57890, 58335, 59103, 17-1 BCA ¶ 36,696, at 178,692-93.  The board also rejected PSI's assertions that its default was excusable because (1) the Army's specifications in the technical data package were defective, (2) the Army's termination decision was arbitrary and capricious, and (3) the Army acted in bad faith in terminating the contract.  Appx69-84, 17-1 BCA ¶ 36,696, at 178,693-702.

Subsequently, the board denied PSI's request for reconsideration. *Pyrotechnic Specialties, Inc.*, ASBCA Nos. 57890 *et al.*, 19-1 BCA ¶ 37,304.

This appeal followed.

## SUMMARY OF ARGUMENT

PSI attempts to retry its case on appeal, challenging the board's factual findings and weighing of evidence.  The board's findings were supported by substantial evidence and the board did not abuse its discretion in making evidentiary rulings, including allowing PSI to present evidence when PSI laid a

proper foundation, demonstrated the relevance of the evidence to PSI's claims before the board, established the evidence was not hearsay, or was within the scope of cross-examination.

The board's conclusion that the Army had justifiably terminated PSI for default when PSI failed to deliver two lots of MK 124s consistent with the modified delivery schedule (which PSI had proposed) is supported by substantial evidence.  In particular, PSI failed to deliver 9,416 MK 124 conforming signals in Lot 4-2 by the August 31, 2011 contractual delivery date.  And, PSI failed to deliver 7,712 MK 124 conforming signals in Lot 4-3 by the September 14, 2011 contractual delivery date.

On appeal, PSI has failed to establish that the board's rejection of its proffered excuses for its default is unsupported by substantial evidence.  As an initial matter, PSI asserts that the board should have found that the Army's decision-making process was "arbitrary and capricious," but the board was required to review the default termination *de novo* under the CDA, and it lacked any statutory authority to conduct the Administrative Procedure Act (APA)-type of review advocated by PSI here and before the board.  In any event, the board's findings that PSI's default was not excused by allegedly defective specifications, by alleged procedural violations by the Army, and by alleged bad faith are supported by substantial evidence.  PSI encountered quality control and other

manufacturing problems – particularly with crimping signals throughout the production – that prevented PSI from meeting the requirements of the Contract. PSI's process, not the specifications, resulted in PSI's default.  And the board's findings that PSI had failed to prove any procedural violations, as well as any bad faith by clear and convincing evidence, are similarly supported by substantial evidence.  Indeed, the evidence demonstrates that most of the bad faith allegations relate to other contracts involving another DCMA QAR, who no longer worked on any PSI contracts after 2006 – when PSI's production of the MK 124s under the Contract started.  The evidence demonstrates that the contracting officer and QAR Mr. Cowart, who worked as QAR throughout the contract, acted without any intent to injure PSI during the administration of the contract.

## ARGUMENT

### I.  STANDARD OF REVIEW

Under the Contract Disputes Act, the board's findings of fact are "final and conclusive and may not be set aside unless the decision is – (A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence."  41 U.S.C. § 7107(b)(2); *Empire Energy Mgmt. Sys., Inc. v. Roche*, 362 F.3d 1343, 1350 (Fed. Cir. 2004).  The board's determination is adequately supported if based on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Gen.*

*Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1378 (Fed. Cir. 2013) (internal

citations and quotation marks omitted).  This Court reviews the board's legal

conclusions *de novo*.  41 U.S.C. § 7107(b)(1); *Gen. Dynamics*, 714 F.3d at 1378.

## II.    THE BOARD'S DECISION SUSTAINING THE DEFAULT TERMINATION IS SUPPORTED BY SUSTANTIAL EVIDENCE

The contract's Default clause permitted the Army to terminate PSI for

default where, among other things, "the Contractor fails to (i) [d]eliver the supplies

or to perform the services within the time specified in the contract or any

extension;" or  (ii) [m]ake progress, so as to endanger performance of this contract.

. . ." 48 C.F.R. §§ 52.249-8(a)(1)(i), (ii); Appx1041 (incorporating this Default

clause by reference in the contract).  "A contractor's failure to make timely

delivery of agreed-upon goods establishes a prima facie case of default." *Gen.*

*Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir.), *modified*

*denying reh'g*, 527 F.3d 1375 (Fed. Cir. 2008).  A defaulted contractor bears the

burden of demonstrating that its default was excusable, arising "from causes

beyond the control and without the fault and negligence of the contractor."  48

C.F.R. § 52.249-8(c); *Gen. Injectables*, 519 F.3d at 1363 ("The burden then shifts

to the contractor to show that the failure to deliver the goods was excusable.").

"Whether or not a default is excusable is . . . a question of fact," and a board's

determination will be upheld if "supported by substantial evidence." *Copeland v.*

-26-

*Veneman*, 350 F.3d 1230, 1233 (Fed. Cir. 2003) (internal citations and quotation marks omitted).

Here, the board found that the Army had justifiably terminated the contract when PSI had failed to timely deliver Lots 4-2 and 4-3 of MK 124 signals. The board's finding that PSI had failed to demonstrate its default was excused is supported by substantial evidence.

## A.     The Default Termination Was Justified

The Army justifiably terminated the contract for default because PSI had failed to "[d]eliver the supplies or to perform the services within the time specified in the contract or any extension." 48 C.F.R. § 52.249-8(a)(1)(i); Appx1041 (incorporating this Default clause by reference in the Contract). Failure to timely deliver supplies under a contractual schedule constitutes a *prima facie* basis for default termination. *Gen. Injectables*, 519 F.3d at 1363. Here, PSI failed to timely deliver two lots of MK 124 signals and, thus, the Army terminated PSI for default.

The parties bilaterally modified the contract to set the schedule for lots in Interfix 4, modifying prior schedules to require PSI to deliver Lot 4-2 by August 31, 2011, and Lot 4-3 by September 14, 2011. Appx2027-2038; Appx49; Appx67. The contract's Submission of Production Lot Samples clause stated, "if the Contracting Officer disapproves any production lot test sample(s), the Contractor shall be deemed to have failed to make delivery within the meaning of the Default

-27-

clause of this contract.  Therefore, this contract may be subject to termination for

default." Appx1031; Appx4; Appx67.  Thus, the Army's rejection of a lot during a

LAT constituted a failure to timely deliver under the Default clause.

The Government rejected two lots due to multiple problems (and not mainly

because of the long smoke times).  First, the Government rejected Lot 4-2 on

September 2, 2011, for failing to meet the acceptance criteria in the Solicitation's

specifications for three reasons reflected in PSI's own testing report:  (1) one signal

leaked during the sealing test – a major defect; (2) one signal failed the

transportation and vibration sealing test, a critical defect; and (3) numerous signals

had long smoke display burn times under multiple tests with the longest display

time at 41.48 seconds.  Appx 2087-2088 (PSI test report); Appx2101 (DCMA

rejection); Appx1111-1112 (specification testing criteria); Appx1107-1108

(referencing critical and major characteristics); Appx53.  DCMA also noted that

PSI's testing had some "disparities" in how it tested the signal samples, showing

PSI was not "following directions."  Appx2101.  Indeed, in the show cause notice,

the Army concluded that DCMA rejected Lot 4-2 "due to several quality-related

failures" by PSI during the LAT.  Appx2108.  Thus, PSI failed to deliver 9,416

MK 124 conforming signals in Lot 4-2 by the August 31, 2011 contractual delivery

date.

Second, the Government also rejected Lot 4-3 because the lot included critical or major defects, including (1) misalignment of the alignment pin on several signals – a critical defect, (2) a sample failed the Sealing test – a major defect, and (3) multiple samples exhibited long smoke display times. Appx3033-3034; Appx2111; Appx56. Thus, PSI failed to deliver 7,712 MK 124 conforming signals in Lot 4-3 by the September 14, 2011 contractual delivery date.

Ultimately, PSI failed to timely deliver two lots of MK 124 signals and the Army justifiably terminated PSI for default. Thus, the board's finding that the Army had made a *prima facie* showing justifying PSI's default termination is supported by substantial evidence. Appx67-68.

### B.    PSI Failed To Prove That Its Default Should Be Excused

PSI failed to prove that its default should be excused. PSI bore the burden of demonstrating its excuse after the Army had established a *prima facie* basis for terminating PSI for default. *Gen. Injectables*, 519 F.3d at 1363. As it did before the board, PSI argues its default should be excused because (1) the Army's specifications were defective, (2) the Army's decision to default PSI was arbitrary and capricious, and (3) the Army had acted in bad faith. Appellant's Opening Brief at 10-20 (ECF No. 15) (PSI Br.). Whether to excuse a defaulted contractor is a question of fact. *Copeland*, 350 F.3d at 1233. As demonstrated below, the

board's findings rejecting PSI's excuses are supported by substantial evidence.

Appx69-84.

### 1. The Board's Finding That PSI Had Failed To Prove That The Army's Specifications Were Defective Is Supported By Substantial Evidence

PSI failed to meet its burden to prove that the Army's MK 124 specifications were defective.  On appeal, PSI challenges the board's findings and the Army's default termination as primarily based on the long smoke display times.  PSI Br. at 18-20.  But, as noted above, PSI was in default for numerous reasons relating to its poor quality control in manufacturing the MK 124 signals.  The board's finding that PSI had failed to prove the Army's specifications were defective is supported by substantial evidence.  Appx70-74.

"[T]he government is entitled to strict compliance with contract specifications."  *TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1342 (Fed. Cir. 2006); *Jet Constr. Co. v. United States*, 531 F.2d 538, 543 (Ct. Cl. 1976) ("In undertaking a contract, the contractor promises to perform according to the contract specifications, and the Government has the right to insist on contractor performance in compliance with them.").  Design specifications carry an "implied warranty that the specifications are free from design defects" that "protects contractors that fully comply with the design specifications" in a contract.  *White v. Edsall Constr. Co.*, 296 F.3d 1081, 1084-85 (Fed. Cir. 2002).  To establish that the

Government breached its implied warranty, a contractor must prove that the contractor performed in "substantial conformity with contract specifications." *Radiation Tech., Inc. v. United States*, 366 F.2d 1003, 1006 (Ct. Cl. 1966).

As the board found, "PSI offers little evidence to support its assertion that it substantially complied with the specifications." Appx70. On appeal, PSI asserts that (1) the board's fact-finding did not support the board's conclusion, because the record allegedly contains no evidence that PSI had committed manufacturing error regarding Lot 4-2; (2) the Army terminated mainly because of the long smoke display times, which were caused by the 3M 433L or 3M 433 sealing disks; and (3) the prior contractor – Martin Electronics – produced millions of signals, but PSI denies that demonstrated the technical data package was sound. PSI Br. at 18-20. The board's decision dispatched with each of these defenses, finding that PSI's production problems had resulted from poor quality control and manufacturing error, not from a problem with the technical data package for the MK 124. Appx69-74.

*Crimping – Manufacturing Error*: The board found that PSI's quality control problems had resulted in repeated failures to properly crimp MK 124 samples – a manufacturing error – that produced  leakers that failed sealing tests and caused other critical malfunctions. Appx72 ("[A]ppellant has failed to carry its burden proving that its crimps were proper and were not the cause of the

failure.").  Proper crimping both hermetically seals the signals at each end and keeps the trigger assembly from blowing apart the MK 124.  Appx72.  The board's findings that  PSI's manufacturing process resulted in improper crimping throughout contract performance and that PSI had failed to adduce evidence that crimping was not the problem are supported by substantial evidence.  Appx72-73.

PSI experienced difficulty with crimping throughout contract performance, including failing its first LAT in Lot 1-1 for poor crimping.  Appx17; Appx638-639.  PSI's poor crimping led to the critical malfunctioning of samples in Lot 3-3 and Lot 3-3a (as PSI itself concluded), which resulted in shutting down the production line for a year.  Appx28; Appx2352-2355.  PSI failed the first FAT for Interfix 4 because it over-crimped signals (as PSI itself acknowledged), resulting in numerous leakers that failed the sealing test.  Appx41-44; Appx1805; Appx72.  Lot 4-2 failed multiple tests regarding sealing (the sealing, and transportation and vibration tests) and PSI failed to follow procedures while conducting its testing of Lot 4-2.  Appx53-54; Appx2101.  The board found that PSI failed to "furnish proof that it complied with all relevant TDP requirements for crimping," adducing no evidence that it properly crimped Lot 4-2.  Appx72-73.  Lot 4-3 included a critical defect regarding the alignment pin, which PSI concluded was the result of its crimping process.  Appx56; Appx2111.  Thus, from Lot 1-1 to Lot 4-3, PSI continued to encounter problems crimping the MK 124 signals – a manufacturing

and quality control error.  The board did not err in concluding PSI failed to demonstrate that it properly crimped the signals.  Appx72-74.  Improper crimping, not defective specifications, resulted in PSI's failure to provide proper signals.

*Long Smoke Display Times:*  PSI asserts that the Army "primarily rejected Lots 004-002 and 004-003 on the basis that the lots had long smoke display times" and that the technical data package was defective because the sealing disk suggested in the specifications inherently led to long smoke display times.  PSI Br. at 18-19.  First, the Army did not "primarily" reject Lots 4-2 and 4-3 for long smoke display times, but rather primarily "due to several quality-related failures" that resulted in critical and major defects in those lots.  Appx2108.  In the termination notice, the Army explained that long smoke display times were not the main reason for termination, contrasting its acceptance of Lot 4-1 on deviation for the long smoke display times, with rejection of Lots 4-2 and 4-3 that had other critical and major defects:  "Lot 2, however, encountered significantly more problems (leaker, 20+ long burns, leaker during T&V (hole in sealing disk due to improper handling), drop test done incorrectly, T&V test performed without protective caps, etc.)."  Appx2134.  The Army also explained that Lot 4-3 had the critical alignment pin defect and several other critical or major defects, including another leaker.  *Id.*  Thus, PSI was not "primarily" in default because of long

smoke display times, but rather because of the numerous critical or major defects in Lots 4-2 and 4-3.

Second, PSI failed to prove that the 3M 433L sealing disks (used in Interfix 1) or 3M 433 sealing disks (used in Interfix 4) in the specifications inherently caused long smoke display times.  Appx72, Appx74.  The board acknowledged that Interfixes 2 and 3, which used the 3M 363L, did not appear to have long smoke display times.  Appx71.  However, during Interfix 4, PSI had concluded that the long smoke display times during the FAT were the result of "flaws in the smoke candle inventory or possibly improper brushing of the bore of the smoke candle during assembly," not due to the sealing disk.  Appx71; Appx46-47; Appx1991-1993.  Moreover, while the five lots accepted in Interfixes 2 and 3 did not have long smoke display times (but included other defects), the board found that in Interfix 1 (using the supposedly flawed 3M 433L sealing disk) PSI had produced three lots without long smoke display times or any other defects.  Appx74; Appx17-20; Appx641-643; Appx647.  Thus, the board's finding that the long smoke display times were not caused by the sealing disks is supported by substantial evidence.  Appx71.

*Martin Electronics Produced 1 Million Signals*:  Martin Electronics, the prior contractor who had produced MK 124 signals for the Government, successfully manufactured more than one million signals using the same technical

-34-

data package without encountering the problems that PSI did.  Appx15; Appx668-669.  PSI attempts to challenge this straightforward fact with testimony of PSI's employee – Andy Long, who previously worked for Martin Electronics – and an incomplete letter from Martin Electronics (PSI provided only the first page).  PSI Br. at 20; Appx911-912 (board admitting the document only to allow PSI to refresh recollection of witness, but calling the incomplete letter "somewhat suspect").

The board discounted Mr. Long's testimony because he had acknowledged that he was not involved in testing the MK 124s while with Martin Electronics and had no knowledge whether Martin Electronics had ever failed any LATs.  Appx15; Appx536.  Instead, the board credited a Government official – Mr. Bowen – who had observed most of the LATs during Martin Electronics' contract (and PSI's) and testified that Martin Electronics had successfully performed, including producing over one million signals, without leakers (or other problems).  Appx15; Appx667-669; Appx915.  Indeed, when presented with the excerpted Martin Electronics letter that expressed concerns about testing the MK 124 and the amount of signals accepted, Mr. Bowen stated that "the entire quantity on the contract was completed" by the time Martin Electronics had completed the contract.  Appx912-913.  The ability of another manufacturer to supply the MK 124s within the specifications serves to rebut PSI's defective specification claims.

*See GLR Constructors, Inc.*, ENGBCA No. 6128, 96-1 BCA ¶ 28,218 (ENGBCA 1996) ("The ability of other contractors to meet the specifications also dictates against any conclusion that the specifications were either defective or commercially impracticable of performance."), *aff'd*, 114 F.3d 1206 (Fed. Cir. 1997) (unpubl. tbl. dec.).

Ultimately, PSI failed to prove that the contract's specifications were defective.  Appx74.  The board's findings are supported by substantial evidence.

### 2.  The Board's Finding That The Army Did Not Abuse Its Discretion In Terminating The Contract For Default Is Supported By Substantial Evidence

PSI similarly failed to establish that the termination process involved an abuse of discretion that would excuse its default termination.  The board's rejection of this excuse is likewise supported by substantial evidence.  Appx74-81.

### a.  The Standard For Abuse Of Discretion In Terminations

As an initial matter, PSI can cite no statute that authorized the board to engage in the type of Administrative Procedure Act (APA) review of the agency's termination decision that it demands here.  *See* 5 U.S.C. § 706 (authorizing review of agency action based on an administrative record).  PSI asserts the Army was "arbitrary and capricious" because (1) its termination decision allegedly failed to consider certain factors; (2) the Navy allegedly disagreed with the Army's determination that Lots 4-2 and 4-3 included defective signals; and (3) the leakers

in Lot 4-2 do not support the decision to terminate PSI for default.  PSI Br. at 16-

18.  But the board was required under the CDA to review the termination for

default *de novo*, and it lacked any statutory authority to review the contracting

officer's termination decision under a traditional APA standard of review.

*Compare* 41 U.S.C. § 7103(e) ("The contracting officer's decision shall state the

reasons for the decision reached and shall inform the contractor of the contractor's

rights as provided in this chapter.  Specific findings of fact are not required.  If

made, specific findings of fact are not binding in any subsequent proceeding."); 41

U.S.C. § 7104(b)(4) (actions brought in court shall proceed *de novo*) *with* 5 U.S.C.

§§ 706(2)(a), (d) ("The reviewing court shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be [] arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law; or . . . without

observance of procedure required by law[.]").

Although this Court's post-CDA precedent does allow for an abuse of

discretion analysis when a court or board conducts a *de novo* review of a

termination, *e.g., McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326

(Fed. Cir. 1999), neither PSI nor the board recognized that the nature of this review

is unlike traditional APA review.  Rather, the board was supposed to apply a four-

part test in reviewing the termination for abuse of discretion:  (1) evidence of

subjective bad faith on the part of the government official, (2) whether there is a

reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation. *United States Fidelity & Guaranty Co. v. United States*, 676 F.2d 622, 630 (Ct . Cl. 1982) (*USF&G*).

Prior to enactment of the CDA in 1978, agencies' resolutions of contractual disputes were subject to review much more akin to APA review. In the nineteenth century, the Government was allowed to designate contractually an authorized representative to decide disputes between the parties. *See Kihlberg v. United States*, 97 U.S. 398 (1878). This representative's determination was final and binding, and absent fraud or gross mistakes implying bad faith "cannot, therefore, be subjected to the revisory power of the courts without doing violence to the plain words of the contract." *Id*. at 401.

In 1951, the Supreme Court held in *United States v. Wunderlich*, 342 U.S. 98 (1951), that the decisions of the contractually-designated representatives were final and binding unless there was evidence of fraud, which the Court defined as "conscious wrongdoing, an intention to cheat or be dishonest." *Id*. at 100. Three years later, Congress enacted the Wunderlich Act to override the Court. The Wunderlich Act provided that the decision of the Government's authorized representative shall be final and conclusive "unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or

-38-

is not supported by substantial evidence." 41 U.S.C. § 321 (2006), *repealed by*,

Pub. L. No. 111-350, 124 Stat. 3677, 3859 (Jan. 4, 2011). The Act further provided

that "no Government contract shall contain a provision making final on a question

of law the decision of any administrative official, representative, or board." 41

U.S.C. § 322 (2006), *repealed by*, Pub. L. No. 111-350, 124 Stat. 3677, 3859 (Jan.

4, 2011).

But, in 1978, the standard of review for a contracting officer's final decision

dramatically changed when Congress enacted the CDA. For one thing, the CDA

allowed the board to entertain appeals from contracting officer final decisions. 41

U.S.C. § 7104(a). And because the contracting officer's specific findings of fact

are not binding in any subsequent proceeding, *see* 41 U.S.C. § 7103(e), the board,

like the Court of Federal Claims, 41 U.S.C. § 7104(b)(4), reviews the contracting

officer's final decision *de novo. E.g., Precision Specialties, Inc.*, ASBCA No.

48717, 96-1 BCA ¶ 28,054 (final decision retains no presumptive evidentiary

weight nor is it binding on the board).

To be sure, this Court has cited Wunderlich Act-era precedent in reviewing

termination decisions for an abuse of discretion. *See McDonnell Douglas,* 182

F.3d at 1326 (citing *Schlesinger v. United States,* 390 F.2d 702 (Ct. Cl. 1968);

*John A. Johnson Contracting Corp. v. United States,* 132 F. Supp. 698 (Ct. Cl.

1955)) (also citing *Darwin Constr. Co. v. United States,* 811 F.2d 593, 598 (Fed.

Cir. 1987)).  But the Court has articulated a four-part test for abuse of discretion that is not incompatible with the *de novo* review mandated by the CDA.  As the Court explained in *McDonnell Douglas*, "[p]roperly understood, then, *Schlesinger* and its progeny merely stand for the proposition that a termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion."  182 F.3d at 1326.  This Court then linked "[t]his proposition" to "the well established law governing abuse of discretion by a contracting official."  *Id*. (citing *USF&G,* 676 F.2d at 630, which listed "four factors to be used in determining if conduct by a government official is arbitrary and capricious: (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation").

This Court's established four-part abuse of discretion test as applied to a termination decision is a far cry from the wide-ranging APA-style review demanded by PSI here and erroneously conducted by the board below.  In *McDonnell Douglas*, for example, the trial court held, after trial, that the contracting officer had abused his discretion in terminating the contract for default because he personally did not wish to terminate the contract at all.  182 F.3d at 1326-27.  This Court reversed not the trial court's findings, but rather the holding,

because the Navy had terminated the contract for default for performance-related reasons. *Id.*

Because the Army here plainly terminated the contract for default for performance-related reasons, Appx2131-2134, PSI's argument that the Army did not adequately consider the subjective opinions and beliefs of the *Navy customer* (not even the contracting officer) could not plausibly serve as a basis for an abuse of discretion. *Cf. Empire Energy*, 362 F.3d at 1357 (stating that "the subjective knowledge of the contracting officer herself is irrelevant"). The board should have stopped its analysis there. Instead, the board needlessly examined PSI's argument and concluded that the Army was not arbitrary and capricious because it had, in fact, considered and terminated despite the Navy's subjective opinions and beliefs. Appx59; Appx79. The board did not apply the Court's four-factor test but rather impermissibly engaged in a traditional APA-type review of the termination decision regarding this and other "arbitrary and capricious" allegations by PSI.

      b.    **The Board's Finding Of No Abuse Of Discretion Is Supported By Substantial Evidence**

Even assuming, for argument's sake, that PSI plausibly presented arguments that the Army had abused its discretion in terminating the contract for default, the board's findings that there was no abuse of discretion would still be supported by substantial evidence.

First, PSI contends that the Army failed "to consider factors" and that was "coupled with premature consideration of default." PSI Br. at 16-17. The FAR includes a list of factors that a contracting officer should consider when exercising discretion to terminate a contractor for default, 48 C.F.R. § 49.402-3(f),[4] but "the regulation does not confer rights on a defaulting contractor." *DCX, Inc. v. Perry*, 79 F.3d 132, 135 (Fed. Cir. 1996). In any event, the board found that the Army contracting officer weighed the FAR's seven factors in the memorandum recommending termination. Appx57-59; Appx79-80. This finding is supported by substantial evidence. Appx2125-2128, Appx57-59; Appx79-80.

Moreover, the Army did not act prematurely in terminating PSI's contract. The Army permitted PSI numerous opportunities to successfully perform, but PSI kept failing. Its critical failure resulted in shutting down production for over a year between Interfix 3 and Interfix 4. Appx28-49. PSI failed both FATs in Interfix 4 and, after the Army had issued a show cause notice for failure to make progress,

---

[4] The FAR lists seven factors, including: "(1) The terms of the contract and applicable laws and regulations. (2) The specific failure of the contractor and the excuses for the failure. (3) The availability of the supplies or services from other sources. (4) The urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor. (5) The degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts. (6) The effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments. (7) Any other pertinent facts and circumstances." 48 C.F.R. § 49.402-3(f)(1)-(7).

the Army allowed PSI to supply lots in Interfix 4 with a modified schedule

proposed by PSI.  Appx1985; Appx2012; Appx2027-2038; Appx46-50.  And, the

Army provided PSI with an opportunity to argue it should be excused from late

delivery of Lot 4-2 (Appx2115-2116), even though the Army was not required to

issue a cure notice for PSI's failure to timely deliver supplies.  48 C.F.R. §§

49.402-3(c) & 52.249-8(a)(1)(i); *Delfasco LLC*, ASBCA No. 59153, 17-1 BCA ¶

36659 ("[W]hen the legal basis for default is failure to deliver by the time required

by the contract (i.e., the basis set forth in FAR 52.249-8(a)(l)(i)), as it is here, the

contractor is entitled to no cure notice, whatsoever.").  These findings, too, are

supported by substantial evidence.

Second, even assuming, for argument's sake, that the Navy's views on

termination somehow could provide a basis for an abuse of discretion finding,

while the Navy had expressed interest in potentially purchasing Lots 4-2 and 4-3, it

did not disagree that those lots were defective.  Appx3079.  The Navy stated "that

continuing to work with PSI to achieve delivery of useable products will be a less

costly option and achieve a better value for DOD compared to the costs of

litigation and settlement with little chance of recouping any prior payments to

PSI."  Appx3079.  Indeed, Mr. Bowen, the Navy official who witnessed most of

PSI's LATs and FATs (including the defective Lot 4-3) over the course of the

contract, confirmed that "the Navy did not take issue at all with the basis for the

termination for default" but "merely" viewed it from a "financial perspective" regarding the termination. Appx666-667; Appx663-664 (witnessed Lot 4-3). The board's conclusion that the Army properly terminated the contract despite the Navy's "objections" was supported by substantial evidence. Appx79.

Third, the board's finding that the leaker signals in Lot 4-2 provided a basis for terminating PSI is supported by substantial evidence. Appx77 ("The Board determines that there was no error in the government's treatment of these tests as failures."). As the board found, sample signal 40 in Lot 4-2 failed the initial sealing integrity test and the test specifications instructed that one failure of this test was sufficient to reject the entire lot. Appx77; Appx53; Appx2087; Appx1108, Appx1111. PSI asserts that signal 40 later passed another "informational" sealing test during the separate five-foot drop test. PSI Br. at 17. However, the board rejected PSI's argument because PSI had never explained what it meant by an "informational test" and, moreover, "a single failure of either test is sufficient basis for rejection of the lot." Appx77. Indeed, the board concluded that "there is nothing to suggest that a signal passing one sealing test forgives the signal failing a separate, required sealing test." Appx77. The board's finding that leaker signals in Lot 4-2 supported the default termination is supported by substantial evidence.

Additionally, Lot 4-2 had a second leaker – signal 109 during the

transportation and vibration test. Appx78. One failure during this test also

independently justifies rejection of the entire lot. Appx78; Appx53; Appx2087;

Appx1108, Appx1111. PSI argues again on appeal that this leaker was not a

manufacturing error, but due to PSI's technician failing to seal the cap properly on

signal 109 during testing at PSI's facility. PSI Br. at 17. The board found PSI

"admits that the testing error was caused by its own personnel's failure to follow

contract required test procedures, and there is no evidence that failure to follow

procedures was due to government action." Appx78 (citing Appx8, Appx53-54).

DCMA's QAR documented other testing irregularities during Lot 4-2, including

that PSI removed sample number 109 to take pictures (even though testing samples

were never to leave the Government's control during testing), PSI inadvertently

repeated a test twice, PSI removed the transportation vibration rounds from their

casing without Government oversight, and removed the same samples from

soaking contrary to Government instruction and without Government oversight.

Appx53-54; Appx2101. The board rejected PSI's argument: "PSI furnishes no

legal authority, and we are aware of none, to support appellant's position that the

government must disregard failure of a test required by the contract because the

contractor failed to conduct the test in accordance with contractually required

procedures." Appx78. The board's findings that these additional test failures

served as a basis to reject Lot 4-2 and to terminate the contract for default are also

supported by substantial evidence.  Appx78.

### 3. The Board's Finding That PSI Failed To Meet Its High Burden To Establish Bad Faith Is Supported By Substantial Evidence

PSI failed to demonstrate that the Government acted in bad faith in

terminating the contract for default.  Substantial evidence supports the board's

finding that PSI had failed to prove bad faith by clear and convincing evidence.

Appx81-84.

A contractor's default may be excused if it can prove that the agency acted

in bad faith in terminating the contractor for default.  *Securiforce Int'l Am., LLC v.*

*United States*, 125 Fed. Cl. 749, 798-99 (2016), *aff'd-in-part and vacated-in-part*

*on other grounds*, 879 F.3d 1354 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 478

(2018); *USF&G*, 676 F.2d at 630 (discussing bad faith as one method of

demonstrating that an agency abused its discretion in terminating a contract).  "The

contractor's burden to prove the Government acted in bad faith, however, is very

weighty." *Krygoski  Constr. Co. v. United States*, 94 F.3d 1537, 1541 (Fed. Cir.

1996).  "[G]overnment officials are presumed to discharge their duties in good

faith." *Road & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368

(Fed. Cir. 2012).  To overcome this burden, a contractor must demonstrate that the

Government had a "'specific intent to injure' the plaintiff by clear and convincing

evidence." *Id*. at 1369 (quoting *Am-Pro Protective Agency v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002)).  PSI asserts incorrectly that it need only show "some evidence of specific intent to injure" and not clear and convincing evidence. PSI Br. at 11.  Clear and convincing evidence "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'"  *Id*. at 1368 (quoting *Am-Pro*, 281 F.3d at  1240).

PSI accuses three different Government officials of acting in bad faith:  (1) Mr. Cowart, DCMA's QAR, for much of the contract; (2) Mike King, a DCMA QAR who left before PSI had begun production on the contract; and (3) Ryan Pierce, who served as the contracting officer at the end of the contract.  PSI Br. at 10-15.  The board's findings that PSI had failed to establish bad faith by clear and convincing evidence are supported by substantial evidence.

*RFD 13 And Smoke Display Times*:  PSI accuses DCMA's Mr. Cowart and the Army's contracting officer, Mr. Pierce, of intending to injure PSI by changing its interpretation of an earlier request for deviation – RFD 13 – and reverting to the original testing specifications regarding the maximum permitted smoke display times.  PSI Br. at 11-12, 14.  The board rejected this contention.  Appx82 ("There is no specific evidence that the change in the maximum smoke display time acceptance criteria during Interfix 4, which resulted from the government changing its interpretation of RFD 13, arose from an intent injure PSI.").

-47-

As discussed above, the contract's testing specifications stated that the maximum permitted smoke display times were to vary from 18 to 25 seconds, depending on the specific test.  Appx1107.  During Interfix 1, the parties agreed to PSI's request for deviation – RFD 13 – for Lot 1-4 to raise the sealing function test maximum smoke display time from 19 seconds to 25 seconds.  Appx18-19; Appx1338-1340.  However, as the Navy's Mr. Bowen testified, the parties generally treated RFD 13 as changing the maximum smoke display times for all tests to 25 seconds (with Mr. Bowen generally considering allowing signals to smoke up to 30 seconds as permissible on deviation).  Appx576-577; Appx664-665; Appx18-19.  Mr. Bowen explained that smoke display times beyond 30 seconds could be problematic, because the smoke candles only included "so much material" and, if it smokes too long, it is less "robust" and would not be seen by a "reconnaissance craft" when a pilot is "bobbing around out on the ocean" waiting for rescue.  Appx665.  At the time of RFD 13, Mr. Pierce was not the contracting officer.

Mr. Pierce became the contracting officer before Interfix 4 and interpreted RFD 13 to only raise the smoke display times for the sealing function test and not the other tests.  Appx82; Appx2046.  Thereafter, PSI (and DCMA's Mr. Cowart) reverted to using the maximum display times used in the contract's specifications, and no longer treated RFD 13 as raising the maximum display times for all tests,

-48-

not only the sealing function test.  Appx51.  The board concluded that there was

"no evidence to suggest CO Pierce's interpretation was the result of anything more

than unfamiliarity with past performance and a differing interpretation of the

RFD."  Appx82.  Notably, even if Mr. Pierce had applied the 25 second maximum

smoke display time for all tests, PSI still would have failed the Lot 4-2 low

temperature test, in which 19 of 20 of the signals exceeded the 25 second

maximum smoke display time from RFD 13 (and 10 of those signals exceeded 30

seconds, with the longest smoking for 41.48 seconds).  Appx2092; Appx78-79.

Similarly, Lot 4-3 had 10 signals with smoke display times longer than 25 seconds

in the low temperature test.  Appx78.  Thus, the board concluded that any change

was immaterial because the Army had ultimately terminated the contract for other,

independently justifiable grounds, including the leakers in Lots 4-2 and 4-3, and

PSI had failed the low temperature tests even using the 25-second maximum

smoke times.  Appx82; Appx2133-2134; Appx78-79.

   *Intent to Terminate After Cure Notice*:  PSI also asserts that Mr. Pierce never

intended to permit PSI to complete the contract when the Army issued the June

2011 cure notice, and that the parties had bilaterally modified the contract to

extend the performance schedule for Interfix 4; according to PSI, an e-mail from

another employee advocating PSI's termination shows bad faith.  PSI Br. at 13.

The board rejected PSI's interpretation and, as the trier of fact, found differently.

-49-

Appx83; Appx48. In particular, a member of the integrated product team (IPT) for

the MK 124 sent an email to Mr. Pierce's supervisor (and copied Mr. Pierce)

suggesting that the team consider terminating PSI. Appx3082. Mr. Pierce never

responded to the email and mostly disregarded the email because it was not

directed to him. Appx884-889. The board concluded, "There is no evidence that

the IPT at large or the CO concurred in the opinion." Appx83; Appx79.

PSI envisions there was some nefarious plan to terminate PSI, but as of July

2011, the Army could have terminated PSI for failure to make progress because

production had been stopped for over a year and PSI had just failed two FATs for

Interfix 4. Instead, the Army allowed PSI to implement a cure to the problems,

and the Army and PSI bilaterally agreed to modify the contract to adopt a schedule

provided by PSI. Appx2027-2038. Ultimately, PSI could not meet its own

suggested modified schedule.

*No Additional Modification*: In August 2011, the contracting officer, Mr.

Pierce, and PSI communicated about potentially modifying the contract again with

another revised production schedule and terminating units for convenience at no

cost to the Government. Appx51-52; Appx2057-2058. PSI asserts that the parties

had an "agreement" that somehow modified the contract. PSI Br. at 13. However,

no agreement was reached. Appx52; Appx83.

On August 19, 2011, PSI proposed a new schedule, reduction of units for Lot 4-2, and increasing units for Lots 4-3 and 4-6. Appx52. Although Mr. Pierce indicated he was "amenable to modifying the current contractual schedule," he explicitly stated that any agreement would "be memorialized in a modification to PSI's referenced contract pursuant to the authority of FAR 43.103(a)(3)" and would terminate for convenience 2,150 signals at no cost to the Government because PSI's proposed schedule would result in the Government losing funding for those signals. Appx2057; Appx52. On August 29, 2011, PSI countered with yet another revised schedule, which would result in terminating for convenience 5,015 signals from the contract, particularly Lots 4-3 and 4-6. Appx52; Appx83-84; Appx2069.

On that same day, PSI provided Lot 4-2 for testing and, that week, Lot 4-2 failed the LAT, which resulted in the Army's show cause notice. Appx52-53. The discussions of modifying the contract "were overcome by events" due to the Lot 4-2 LAT failure and that any potential modification was premised on PSI continuing to produce acceptable lots. Appx52; Appx891-892; Appx838. As the board found, "the contract was never modified" to include these new proposed terms. Appx52; Appx83-84. The board found that there was "no evidence of bad faith in the government's attempts to work with the contractor to execute such agreements" modifying the contract. Appx84.

PSI also asserts that because it informed Mr. Pierce that PSI was having difficulty with some supplies based on a subcontractor, its inability to timely deliver units should be excused as beyond the control of PSI. PSI Br. at 14. However, "an unexcused default by a subcontractor does not excuse nonperformance by the prime contractor." *Gen. Injectables*, 527 F.3d at 1376. PSI never offered evidence proving that PSI's default was caused by its subcontractor, much less evidence that PSI should be excused from that cause. Appx855.

*Mr. King Was Not Involved In The Contract*: PSI asserts that the actions of DCMA's QAR Mr. King to allegedly falsely accuse PSI of fraud adversely affected PSI's contract performance. PSI Br. at 2-3, 12. However, Mr. King was no longer serving as a QAR for PSI's facility after 2006, when PSI began production under the contract, and his fraud allegations about PSI had no relationship with the contract. Appx252; Appx241-242 (acknowledging that Mr. King was not a QAR after 2006). All the actions described by PSI regarding Mr. King related to other contracts. Appx245-247; Appx251-252; Appx15 ("None of the fraud allegations are related to the contract at issue in these appeals or the MK 124."); Appx84. And, Mr. King's actions and fraud allegations played no role in the Army's termination of this contract. Appx902. Thus, the board properly rejected PSI's assertions regarding Mr. King. Appx84; Appx15-16.

*Mr. Cowart's Actions Were Proper*: PSI asserts that QAR Mr. Cowart acted improperly in overseeing PSI and unnecessarily issued Corrective Action Requests. PSI Br. at 3, 11-12. However, PSI relied on the testimony of a witness – Richard Profeta – who did not work on the MK 124 contract, based his impressions on one event on another contract, and did not observe Mr. Cowart's actions regarding this contract. Appx250-252; Appx265. Indeed, Mr. Cowart properly issued Corrective Action Requests throughout the contract, including when a signal blew apart in Lot 3-3. Appx2345-2346; Appx2351-2355. And, in response to the alignment pin problem on Lot 4-3. Appx2111-2112; Appx56. And, contrary to PSI's implication, when PSI complained about Mr. Cowart, his supervisors found PSI's complaints "non-valid." Appx726-727.

Ultimately, the board found that PSI had failed to prove, by clear and convincing evidence, any intent by the Government to injure PSI. Appx82-84. PSI fails to establish that these findings are unsupported by substantial evidence.

## III.    PSI HAS FAILED TO ESTABLISH THAT THE BOARD ABUSED ITS DISCRETION IN RULING ON EVIDENTIARY OBJECTIONS

The board did not abuse its discretion in ruling on evidence PSI attempted to present during the hearing. Indeed, the board permitted PSI to present its evidence when PSI laid a proper foundation, demonstrated the relevance of the evidence to PSI's claims before the board, established the evidence was not hearsay, or was within the scope of cross-examination. *Pyrotechnics*, 19-1 BCA ¶ 37,304, at

181,472, Appx3140-3141.  PSI raised these same concerns to the board in its

motion for reconsideration, but the board denied PSI's motion.  *Id.*

"Procedural matters relative to discovery and evidentiary issues fall within

the sound discretion of the board and its officials." *Johnson Mgmt. Grp. CFC, Inc.*

*v. Martinez*, 308 F.3d 1245, 1252 (Fed. Cir. 2002) (internal quotation marks and

citation omitted).  This Court will not overturn an evidentiary ruling of the board

"unless an abuse of discretion is clear and is harmful." *Id.* (internal quotation

marks and citation omitted).  "Appellate review of evidentiary rulings is extremely

restricted; it must be shown that there was manifest error, such as a reasonable

likelihood that the improper exclusion of evidence prejudiced the outcome." *Nat'l*

*Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed. Cir. 1996).  Here,

the board neither abused its discretion nor committed manifest error in ruling on

the Army's evidentiary objections.

PSI challenges the board's evidentiary decision to exclude deposition

testimony of Michael King (a former Army QAR) that related to a fraud

investigation of PSI that pre-dated the termination of PSI's contract by four years.

PSI Br. at 21-23 (citing Appx188-191).  ASBCA Rule 8(b)(2) states:  "No

testimony taken by deposition shall be considered as part of the evidence in the

hearing of an appeal until such testimony is offered and received in evidence at

-54-

such hearing.  It will not ordinarily be received in evidence if the deponent can testify at the hearing."  ASBCA R. 8(b)(2), 48 C.F.R. Ch. 2, Appx A.

The board properly excluded this document because PSI had failed to lay a foundation for the relevance of the document and failed to call Mr. King as a witness.  Appx190-191.  In particular, the board judge explained to PSI that it needed to lay a foundation for why it intended to use the deposition.  Appx188-189 ("[I]t is necessary for you to lay a foundation to explain why this is relevant to the matter before us now.").  The board then permitted PSI to question the witness – PSI's CEO, David Karlson – to lay a foundation for the document.  Appx189-191. The board stated that it would permit PSI "to provide background in context . . . using Mr. Karlson's testimony" but "unless you can give me direct relevance to the matters at issue here, then I will only allow you to examine Mr. Karlson with respect to background in context and I will not give this document any weight." Appx190-191.

The board also excluded the deposition testimony because PSI had stated it did not intend to call Mr. King as a witness and never asserted Mr. King was unavailable.  Appx191.  PSI now asserts that "PSI believed Mr. King was stationed abroad and unable and unavailable to be subpoenaed to testify."  PSI Br. at 23 n.1. However, that was not what PSI told the board during the hearing.  The board judge attempted to determine why Mr. King was not testifying (including asking if

he was deceased – one of the standard reasons a deposition transcript is permitted in Federal courts). Appx211; Fed. R. Civ. P. 32(a)(4)(A); *see Phoenix Data Solutions LLC*, ASBCA No. 60207, 18-1 BCA ¶ 37164, at 180,928 n.6 (ASBCA 2018) (noting that deposition testimony was permitted because party demonstrated that witness was unavailable under Federal Rules). PSI acknowledged that Mr. King was alive. Appx211. However, PSI stated it was not intending to call Mr. King as a witness: "To the best of my knowledge, we're not going to call him as a witness, but if the government plans on it." Appx211-212. PSI did not state that Mr. King was unavailable or that they would have called him if they thought they could. Instead, PSI simply hoped that the Army would call Mr. King as a witness (even though Mr. King was not on the Army's witness list). Appx212. Given PSI's failure to explain or argue that Mr. King was unavailable, the board did not abuse its discretion and properly excluded the deposition testimony under ASBCA Rule 8(b)(2), 48 C.F.R. Ch. 2, Appx A.

Next, PSI selectively quotes from the hearing transcript (Appx215-216), but fails to acknowledge that the board admitted the document at issue during the hearing. PSI Br. at 23-34. PSI sought to use a document that related to Mr. King accusing PSI of "fraudulently signing" his name. Appx213-214. The board admitted the evidence over the Army's objection: "Objection overruled. I'll admit it for its probative value." Appx216.

PSI next quotes pages from the transcript (Appx216-217) regarding another objection lodged by the Army.  PSI Br. at 24-25.  However, the board permitted PSI to lay a foundation and heard testimony regarding this line of questioning.  Appx219 ("I will give you the opportunity to lay a foundation."). Thereafter, the board permitted further testimony and finally explicitly overruled the Army's objection as to relevance.  Appx219-222.

PSI next quotes another of the Army's objections (Appx227-229), but the board judge again denied the objection and admitted the evidence:  "I will admit it for its probative value and as I explained to you earlier, the probative value will be high or low depending on the level of connection you can make in the authority of the witness that you're using to testify about a particular event document, et cetera."  Appx229.

PSI quotes an exchange (Appx238-239) where the Army objects to PSI's "failure to lay the foundation to tie the events with respect to the FBI investigation and contract to the matter before us."  Appx239; PSI Br. at 26-27.  The board then explicitly offers PSI the "opportunity to lay that foundation."  Appx239.  But, PSI's representative stated, "I have nothing further to say on that."  Appx239.  Given PSI's failure to lay a foundation after being given the chance to do so, the board properly sustained the foundation objection.  Appx239.  The board did not abuse its discretion in sustaining the objection.

PSI quotes another foundation objection made by the Army regarding testimony related to Mr. King.  Appx241-242; PSI Br. at 27.  Again, the board allowed PSI to lay a foundation and the board overruled the objection and permitted the testimony.  Appx242.

Finally, PSI quotes its cross-examination of the Army's contracting officer, Mr. Pierce, and the Army's objection that PSI's questions went beyond the scope of direct.  PSI Br. at 27-29; Appx899-902.  Under the Federal Rules of Evidence (which the board uses as a guide), "Cross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.  The court may allow inquiry into additional matters as if on direct examination."  Fed. R. Evid. 611(b); ASBCA R. 10(c), 48 C.F.R. Ch. 2, Appx A ("The Federal Rules of Evidence are not binding on the Board but may guide the Board's rulings.").  Here, the Army objected to the scope of cross-examination because the Army did not ask the contracting officer "anything about fraud" and he was not listed as a witness for PSI.  Appx899.  The board partially sustained the objection, but permitted PSI to ask the contracting officer "whether he considered fraud in terminating this contract."  Appx900.  PSI then elicited testimony, in which the contracting officer stated he did not consider fraud as part of his termination decision.  Appx902.  Thus, the board did not abuse its discretion by

limiting PSI's cross-examination to relevant testimony to the termination of the contract.

PSI asserts that the board erred and "appeared to recognize its error and slowly admitted more evidence" as the hearing continued.  PSI Br. at 29.  The board rejected PSI's assertion that it had ruled inconsistently or done so because the evidence related to bad faith allegations:  "The contested questioning was not rejected because it dealt with bad faith *per se*, but because PSI failed to lay a proper foundation; demonstrate the relevance of the attempted examination; or establish that it was not eliciting unacceptable hearsay from a nondeclarant." *Pyrotechnics*, 19-1 BCA ¶ 37,304, at 181,472; Appx3141.  "Appellant was allowed to proceed after laying at least a minimal foundation and the testimony was accepted for its probative value and after narrowing the scope of cross-examination to matters raised during direct questioning."  *Id*. (internal citations omitted). Indeed, as it did before the board, PSI fails to explain what rule or other legal authority the board transgressed.  *Id*.  The board's evidentiary rulings were consistent with law.

Ultimately, as discussed above, the board admitted much of PSI's evidence after it established foundation and relevance regarding its bad faith allegations. And, as discussed above, the board explicitly found it had jurisdiction to consider bad faith.  Appx81-84.  After weighing the evidence and PSI's arguments, the

board concluded that PSI had failed to demonstrate the Army had acted in bad faith administering and terminating PSI's contract. Appx81-84. PSI has failed to establish that the board abused its discretion in making the challenged evidentiary rulings.

## **<u>CONCLUSION</u>**

For these reasons, the Secretary of Defense respectfully requests that this Court affirm the board's decision sustaining the Army's termination of PSI's contract for default.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

ROBERT E. KIRSCHMAN, JR.
Director

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

/s/ Daniel S. Herzfeld
DANIEL S. HERZFELD
Trial Attorney
U.S. Department of Justice
Civil Division
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0344
Fax: (202) 514-8640
Email: daniel.s.herzfeld@usdoj.gov

April 20, 2020                          Attorneys for Appellee

## **CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 20, 2020, a copy of the foregoing BRIEF OF APPELLEE was filed electronically.  This filing was served electronically to all parties by operation of the Court's electronic filing system.

/s/ Daniel S. Herzfeld

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(B), this brief contains 13,584 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b) (cover page, disclosure statement, tables of contents and citations, certificates of counsel, addendum with statutes, rules, or regulations, signature block, proof of service, and statement of related cases), calculated by Microsoft Word – the word processing program used to prepare this brief – using a 14-point proportionally spaced typeface and type style pursuant to Fed. R. App. P. 32(a)(5) & (6).


/s/ Daniel S. Herzfeld