No. 19-2024

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

Pyrotechnic Specialties, Inc.,

*Appellant*,

v.

Secretary of Defense,

*Appellee*.

---

On Appeal from the Armed Services Board of Contract Appeals,
Nos. 57890, 58335, 59103
The Hon. Reba Page, Richard Shackleford, Owen Wilson

---

Appellant's Reply Brief

---

M. DEVLIN COOPER
Georgia Bar No. 142447
KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Appellant*
170 College Street
Macon, GA 31201
(478) 841-9007

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 19-2024 |
| **Short Case Caption** | Pyrotechnics Specialties, Inc. v. Secretary of Defense |
| **Filing Party/Entity** | Appllant Pyrotechnics Specialties, Inc. |

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/10/2020

Signature: /s/ Michael Devlin Cooper

Name: Michael Devlin Cooper

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Pyrotechnics Specialties, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  | Cooper Barton & Cooper, LLP was previously known as Cooper, Draughon & Cooper, LLP |  |
|---|---|---|
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |

## II.    TABLE OF CONTENTS

I.     Certificate of Interest ………………………………………...…..…….… p. i

II.    Table of Contents……………………………….………..… p. ii, iii

III.   Table of Authorities ……………………….…………...…..... p. iii, iv

IV.    Statement of Related Cases……….…………….…………….…...……. p. iv

V.     Jurisdictional Statement……………………………..……...…..... p. 1

VI.    Relevant Regulatory Provisions…………………..……….…...……. p. 1

VII.   Statement of Issues…………………………………………...........… p. 1

VIII.  Statement of Case ….………....……………………….……….…...…. p. 1

IX.    Summary of Argument………….....…………….……….……………..… p. 1

X.     Argument ………….……….…………….……….……….……. p. 2

A. The Default Termination was Improper and Must be Converted to a Termination for Convenience. ……………………………….…… p. 2

1. The Termination of the Contract Must be Converted to a Termination for Convenience Because the TDP was Defective ………………………………………………..….… p. 5

i.    Appellee makes misleading citations to the Record that, when corrected indicate that termination for default was improper .…………………….…. p.6

ii.   Crimping was not a pervasive problem and defects in the Signal were the product of a defective TDP not an issue in the quality of production………... p.9

iii.  The TDP was defective regardless of crimping and the termination for default must be converted to a termination for convenience ………………… p.12

iv.   Martin Electronics' Performance proves the TDP was defective and that termination for default was improper ………………………….………. p.14

v.   Conclusion ……………………………..… p. 17

B. The ASBCA Erred by Not Allowing PSI to Present All of the Relevant Evidence of the Government's Bad Faith …………………….…..… p. 18

1. The ASBCA Improperly Excluded Michael King's Deposition Testimony thereby preventing the admission of substantial evidence of the Government's bad faith …..…………….…..… p.19

2. The Hearing Transcript Demonstrates that Substantial Evidence of Bad Faith was Improperly Excluded and that the Government Intentionally Harassed the *Pro Se* Litigants to Suppress Legitimate Lines of Questioning ………………………….... p. 21

3.   Conclusion ………………………………………...………. p.27

XI.   Conclusion and Statement of Relief Sought…………….…..……… p. 27

XII.   Certificate of Compliance ………………………...………….. ……. p. 29

XIII.   Certificate of Service …………………………...……………. …. p. 30

## III.   TABLE OF AUTHORITIES

**Statutes:**

Rules of the Armed Service Board of Contract Appeals Rule 8(b)(2)….…...…. p. 20

Federal Rules of Evidence, Rule 401……………………….……………….p. 22, 23

Federal Rules of Evidence, Rule 611……………………….……………….p. 24

Federal Rules of Evidence, Rule 801……………………….…………….p. 20

**Cases:**

*Hol-Gar Mfg. Corp. v. U.S.*, 175 Ct.Cl. 518, 525, 360 F.2d 634 (1966). ...…..… p. 5

*In Re Abs Baumaschinenvertrieb Gmbh*,  No. 48207, 00-2 B.C.A. (CCH) ¶

    31090 (A.S.B.C.A. Aug. 29, 2000). ………………………….......… p. 5

*JRS Mgmt. v. Lynch*, 621 F. App'x 978 (Fed. Cir. 2015) ……………...……. p. 18

*SIPCO Servs.s & Marine, Inc. v. U.S.*, 41 Fed.Cl. 196, 220 (1998). ………….. p. 5

## IV.    STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Pyrotechnic Specialties, Inc.,

states that:

(a) no appellate court has heard an appeal from the proceeding in this case; and

(b)  there are no cases known to counsel to be pending in this or any other court

 that will directly affect or be directly affected by this Court's decision.

# V. JURISDICTIONAL STATEMENT

On June 13, 2019, Appellant Pyrotechnic Specialties, Inc., filed a timely petition for review of the Armed Services Board of Contract Appeals (hereinafter, "ASBCA") decision of April 10, 2019. ASBCA had jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The ASBCA's decision was final and an appeal is ripe. This Court has jurisdiction pursuant to 41 U.S.C. § 7107.

# VI. STATEMENT OF ISSUES

1. Whether the ASBCA failed to correctly apply the law to the facts;

2. Whether the ASBCA erred in preventing PSI from presenting full evidence in its possession of the Government's bad faith.

# VII. STATEMENT OF THE CASE

Appellant hereby incorporates the facts as alleged in Appellant's Opening Brief.

# VIII. SUMMARY OF ARGUMENT

The Board's Order failed to correctly apply the law to the facts for the issues of whether the Government acted in bad faith, whether the Government was arbitrary and capricious in terminating the contract for default, and whether the TDP was defective. Additionally, the Board improperly excluded evidence, leading to a decision undermined by numerous plain evidentiary errors that prevented the Board from reviewing the whole record.

# IV.    ARGUMENT

It is important to clarify some legal questions and correct some significant factual errors made both by the Armed Services Board of Contract Appeals (hereinafter "ASBCA") and Appellee that are unaddressed.

First, footnote 1 of Appellee's Brief states that PSI owes $1,433,315.42. Even if liable, this sum is incorrect. The original sum due was $1,032,636.52; then the debt was transferred to the Treasury Department which assessed $289,138.23 in fines.

PSI made payments reducing the sum to $1,139,681.78. PSI requested that the debt be deferred, and the Government confirmed that payment was deferred. PSI was sent back to the Treasury Department for collection of more fines, an additional $319,110.90, for a new debt totaling $1,453,792.63. The Government stated it was still examining the request for deferment, meaning that the debt never left the Treasury Department, which means it would be impossible for the debt to be "returned" to the Treasury Department to impose the second set of fines. Thus, the second set of fines was improper, illogical, and possibly, the product of bad faith.

## A. The Government's Default Termination was Improper and Must be Converted to a Termination for Convenience.

Appellee misunderstands and ignores important testimony about the testing data for the MK124, Mod 0 Smoke & Illumination Signals (hereinafter, "Signals").

2

A correct understanding of the data demands converting the termination from one of default to one of convenience.

Appellee contends that default termination was appropriate because some Signals in Lot 4-2 and Lot 4-3 failed quality control tests. Gov. Br. at 27-28. Indeed, Appellee insists Lot 4-2 failed testing because (1) one Signal leaked during the sealing test; (2) one Signal failed the transportation vibration test; and, (3) there were long smoke times. Yet, the record reveals that the Signal that "leaked" was test-acceptable "air occlusion," as the Signal passed a subsequent test and functioned properly later. Appx2087. Moreover, the Signal that failed the vibration test "failed" because there was a hole in the seal during a subsequent seal test. The vibration test would not cause holes in the seal, as that test is concerned with alignment and internal movement. Thus, the hole in the seal, as was determined at the time of testing, was caused by mishandling, not defective production. Appx2089. Finally, long smoke times were not a proper basis on which to fail the samples as the display time requirements had been modified and the long smoke times were the product of the defective Technical Data Package (herein, "TDP"). Appx18.

The rejection of Lot 4-2 was baseless. Two of the three reasons for the lot's rejection were factually incorrect and not related to quality. The third reason was both factually incorrect due to the application of the wrong test standard and the consequence of the defective TDP.

3

The Government also contends Lot 4-3 was justifiably rejected due to (1) misalignment of an alignment pin on one Signal; (2) a leaker; and, (3) long smoke times. Gov. Br. at 29. In a sample of 135 tested Signals, one signal failed the sealing test, and another had an alignment pin that had not been fully pressed into the alignment hole. Appx3033-35. Critically, alignment of igniters and separation was empirically proven to occur regardless of the quality of the crimp and is the product of the defective TDP. Appx1584, Appx1592. Both of these errors were minor defects and easily corrected and were not a basis for rejection. Appx690. Again, the long smoke times should have been accounted for under the modified acceptance criteria and were the unavoidable consequence of the defective TDP. Appx18; Appx408-410.

Thus, none of the Signals in either Lot 4-2 or 4-3 should have been rejected on quality control grounds. Regardless of whether the Government could have correctly rejected these lots on any of the aforementioned basis, the fact that the Government relied on all of the foregoing incorrect and mispresented facts in making its determination evidences that the Government either did not consider the full record in reaching its decision or it ignored critical facts.

Regardless of whether the Signals failed the quality tests, PSI's performance was still excused due to the defective TDP.

1) <u>Termination Must be Converted to one for Convenience Because the TDP was Defective.</u>

"[I]f the contractor is bound to build according to plans and specifications prepared by the owner, [. . .] the contractor will not be responsible for the consequences of defects in the plans and specifications." *SIPCO Servs. & Marine, Inc. v. U.S.*, 41 Fed.Cl. 196, 216 (1998). There is an implied warranty that the TDP will produce a satisfactory product. *SIPCO*, 41 Fed.Cl. at 216; *Hol-Gar Mfg. Corp. v. U.S.*, 360 F.2d 634 (1966)). To be clear,

Where the design specifications are defective and the Government has breached its warranty of suitability, even though there may be a number of causes contributing to nonperformance that can be traced to Appellant's fault, the termination for default is improper and must be converted to a termination for the convenience of the Government.

*In Re Abs Baumaschinenvertrieb Gmbh*, No. 48207, 00-2 B.C.A. (CCH) ¶ 31090.

The ASBCA summarily rejected PSI's argument that the TDP was defective on the basis that PSI failed to demonstrate substantial compliance with the TDP in the production of Lot 4-2 and Lot 4-3, specifically finding that PSI had offered "no evidence" that Lots 4-2 and 4-3 had been properly crimped. Appx71. In realty, as will be shown below, PSI presented substantial evidence both that it properly crimped the Signals, that crimping was not a problem, and that the defects would have been present regardless of 100% perfect crimping.

i)    *Appellee makes misleading citations to the Record that, when corrected, indicate that termination for default was improper.*

Appellee and the ASBCA makes several incorrect and misleading citations regarding crimping. These mistakes are of critical importance because the record, absent such errors, does not support the ASBCA's decision.

Appellee contends that, "[a]fter the Government continued to request a root cause of the problem, PSI eventually concluded that the thickness of 3M 363L sealing disk was the cause of the defects in Lot 3-3A because it kept the Signals from crimping properly." Gov. Br. At 15. This quotation is out-of-context, and the full quotation contradicts the point that Appellee tries to establish with this quote. The rest of the quote states, "PSI has determined the root cause of the discrepancy is due to the Sealing Disk. The thickness of the disk creates too much back-pressure, which caused the flare igniter assembly to work free *regardless of crimp*." Appx1592-93 [Emphasis added]. This is critical. Appellee maintains that the central reason for defects was PSI's inability to comply with the TDP due to PSI's improperly crimping the Signals. Yet, the full quote reveals that the TDP's mandated seal was inherently defective, "regardless of crimp." Appx1592-93. That testimony, despite Appellee's reliance upon it, supports the contention that the termination should be converted to one for convenience.

Appellee contends DCMA rejected PSI's root cause analysis stating, "the test data as presented appears to show more of a quality deficiency with the production

line than a sealing disc issue." Gov. Br. at 15. In fact, "DCMA determined: 'Based upon the data submitted *root cause in this instance is not conclusive*.'" Appx37 [Emphasis added]. Thus, DCMA did not conclude defects were caused by poor production quality. Moreover, the actual root cause analysis states, "PSI proved before the testing commenced that the crimp conformed to drawing requirements. The units were built to meet all requirements, yet the flare housing still detached itself from the outer container." Appx1592. Thus, contrary to Appellee's assertion that DCMA determined the problem was defective crimping, DCMA actually made no conclusive findings, conducted no test(s) of its own, and disregarded positive evidence by witnesses with personal knowledge that the defects with the Signals were occurring regardless of the quality of crimping.

Similarly, Appellee argues, "the Army did not 'primarily' reject Lots 4-2 and 4-3 for long smoke display times, but rather primarily 'due to several quality related failures' that resulted in critical and major defects in those lots." Gov. Br. at 33. First, the quote is just the Army reciting DCMA language and is not an independent analysis by the Army. Second, and more critically, the letter is nothing more than a summarization of numerous pages of test data, that is not specific to Lots 4-2 or 4-3, that show that the cause of rejection was due to long smoke times, not crimping. In fact, of the sixteen lots that had rejectable defects, seven of the lots were deemed defective due to long smoke display times, the closest second being four lots with

leakers. Appx17-20, Appx50-56, Appx643-47, Appx1338-40, Appx2065-66, Appx2088, Appx2101, Appx3034. Critically, these leakers occurred during the first test and then later when PSI was forced to increase the crimping parameters to satisfy a new Government mandated test that was added in addition to the TDP requirements. Appx3087. This means that the second most common cause of rejection after smoke time was also not the fault of PSI but rather the product of the Government's new testing requirement. As such, it is correct to state that the primary cause of rejection was the long smoke times, which were erroneously recorded as failures due to the Government's failure to use the proper testing standard and the inherently defective TDP. Appx18.

Appellee confuses the facts by stating that a defect concerning an alignment pin in Lot 4-3 was an issue with crimping. Gov. Br. at 32. However, a review of the record shows that it was not a crimping defect but, rather, a defect that appeared "during the crimping process." It was not an error in crimping, but rather an error in the alignment pin that was corrected by "changing … production work instructions relating to the transportation of MK 124s to the crimping station and requiring visual inspection of the alignment pin." Appx56, Appx2111. Thus, it was not a matter of defective crimping as the shortened quotation might suggest but, rather, an issue with transporting alignment pins that becomes realized upon arrival at the crimping station.

Without these errors, the record does not support the ASBCA's decision and the termination should be converted to one for convenience.

ii)   *Crimping was not a pervasive problem and defects in the Signals were the product of a defective TDP.*

The ASBCA's analysis is flawed and fails to address the substantial evidence demonstrating both that crimping was not a problem with PSI's production of the Signals and that there were no crimping problems in either of the rejected Lots 4-2 or 4-3 that led to termination of the contract. Appellee matter-of-factly states that PSI had "difficulty with crimping throughout performance" while citing to unrelated documents. Gov. Br. At 32. Appellee further states that PSI's "poor crimping…resulted in shutting down the production line for a year." *Id*. Both statements are incorrect.

The Government's principal witness, Mr. Bowen, testified that, other than an initial problem with crimping in the very first lot and over-crimping caused by the Government's introduction of a new test in Interfix 3, the problem with crimping was "brought to PSI's attention, so their vendor was able to correct that issue, *there was no further issues with crimping*." Appx673. [Emphasis added]. Thus, the Government's principal witness and agent disagrees with the statement that PSI had trouble with crimping "throughout performance" belying both Appellee's argument and the basis of the ASBCA's Order. Indeed, this judicial admission by the

Government proved PSI's compliance with the TDP and should have shifted the burden to the Government to show that the TDP was not defective.

Appellee maintains that PSI's "critical failure resulted in shutting down production for over a year between Interfix 3 and Interfix 4." However, the delay was related to a Corrective Action Report (CAR) and the length of the delay was due to negotiations between the Government and PSI. Appx28-49. Very simply, the length of the production hold was not the byproduct of deficiency in quality.

During Interfix 3, PSI briefly experienced crimping problems because it had to increase the crimping pressure to 900 pounds per square inch in order to comply with a totally new, Government mandated test that was not in the original contract. Appx3087. These problems with crimping were solely the product of the Government adding additional requirements on top of the TDP that made it even more difficult to produce the Signals. Appx347. The increased pressure was not used during Lots 4-2 or 4-3 and crimping problems were not experienced in these lots as the problem with overpressure had been discovered in a previous lot. Appx1805. In fact, the only time that crimping was brought up during the entirety of testing Lots 4-2 and 4-3 was during the testing of Lot 4-3 when Mr. Cowart, after a successful test, failed to convince his Government inspection team members that the crimp was improper by trying to cause separation with a torque wrench; Mr. Cowart failed to

cause any movement, proving that the crimps were effective. Appx374, Appx3090. Nothing in the record contradicts that Mr. Cowart failed in his demonstration.

In addition to the absolute absence of crimping problems identified by the Government in Lots 4-2 and 4-3, PSI presented substantial and compelling evidence that it complied with the crimping requirements. First, PSI's witnesses testified to adhering to the strict mandates of the TDP. Appx374-75, Appx381. Second, to ensure that the Government was aware the crimping was properly done, starting with Lot 3-3A, PSI undertook corrective action to set the crimper so that it was not possible to improperly crimp the Signals. Appx330. PSI also showed the Government the new crimping procedure and then "each and every one of those rounds was torque tested in the presence of the Government personnel watching the test… to demonstrate that… these samples were crimped correctly" and that the new procedure was flawless. Appx331, Appx413-14. Thus, not only were no issues with crimping found to be present in the rejected lots, but additionally, the Government was present and admitted to observing the completely correct crimping methods that PSI instituted prior to the production of the rejected lots. Appx2253.

PSI did not have trouble with crimping or otherwise conforming to the TDP requirements, which is supported by the substantial evidence of the record. The TDP was defective and following its mandates resulted in faulty Signals.

iii)    *The TDP was defective regardless of crimp and the termination must be converted to one for convenience.*

PSI presented substantial evidence to the ASBCA that, even if there was an improper crimp, the TDP was inherently defective due to the failure of the foil sealing disk. "[T]he thickness of the disk created too much back-pressure, which caused the flare igniter assembly to work free *regardless of crimp*." Appx1584 [Emphasis added]. Thus, the ASBCA's fixation with the crimping process is misguided as empiric studies of the manufacturing process revealed that the problems with the sealing disks existed at all times "regardless of crimp." Appx1584, Appx1592. Moreover, PSI conducted a full MK124 Foil Seal Evaluation in 2010 that demonstrated that the performance issue was seal related, even with all samples fully crimped. Appx1628. Indeed, during a specialized control test, multiple Signals experienced leaking and long smoke times even when a review, *under an actual microscope*, revealed that "there was no visible evidence of cracks, scratches or deformities in the outer container crimp." Appx1628.

Additionally, PSI double crimped a test group to ensure proper crimp and compared it with single crimped containers, noting that, "double crimped showed no discernable difference in gap measurements." Appx1632. "This disk is too thick and creates the back pressure and separation of the housing from the outer container … *even when the rounds are crimped correctly*." Appx2115 [Emphasis added]. "[W]ith the 3M 363L disk mandated in the TDP we had a high probability of seeing gradual

separation… *Despite the fact that the units were 100% crimped correctly*." Appx3085 [Emphasis added].

Moreover, as both the ASBCA and the Government note, the purpose of crimping is to seal the Signal at each end and to keep the trigger assemblies in place. Appx72. Thus, crimping is not related to smoke display time, and the ASBCA's correlation of the two was not logical. PSI proved through empirical controls, where crimping was perfect, that the defects that resulted in the rejection of the lots still appeared. Critically, the defect of smoke display times that resulted in the rejection of Lots 4-2 and 4-3 were the products of the defective TDP and defective seal design. This is further demonstrated by the fact, as the ASBCA admitted, that the defects such as long smoke displays that caused the rejection in Lots 4-2 and 4-3 were absent during Interfix 2 and 3. Appx71. This is notable because PSI used a different seal during Interfix 2 and 3 to resolve the defects in the TDP, instead encountering different problems as a result of the new seal. Appx385-386.

Of course, even when PSI changed the seal and solved the long smoke display problem, as acknowledged by the ASBCA, see Appx71, other problems arose because, just like a sliding tile puzzle, the resolution of one problem created a another one. Most, if not all, of the defects found in PSI's production of the MK124 that were not smoke display time related can be traced to PSI's attempt to cure the

inherit defects in the TDP or the Government's implementation of new tests. Appx385-386.

Thus, PSI established that it properly performed under the contract in general and, more specifically, during Interfix 4, and PSI showed that the TDP was inherently defective due to the inability of the mandated seal to routinely meet the Government's performance requirements.

iv) *Martin Electronics' Performance proves the TDP was defective and that termination for default is improper.*

Appellee places significant weight on the fact that Martin Electronics was apparently able to effectively produce the MK124 Signals. However, as set forth below, the history of Martin Electronics' performance actually proves that the TDP was defective. Moreover, both the ASBCA and Appellee ignore the critical testimony of Andy Long.

Mr. Long testified that the MK124 was an "extremely difficult item to manufacture," and specifically, he described it as "virtually un-producible" with "a lot of pitfalls in the design that makes it easy to make mistakes during assembly." Appx537. Mr. Long also testified that Martin Electronics had significant problems with leakers in the production of the MK124. Appx536.

Appellee contends that it is appropriate to disregard Mr. Long's testimony and rely solely on Mr. Bowen's, as the ASBCA did, because Mr. Long did not personally witness the testing at Martin Electronics. However, if this is an appropriate reason

to disregard Mr. Long's testimony, then it is also appropriate to disregard Mr. Bowen's testimony. Mr. Bowen testified that he neither participated in nor supervised the testing at Martin Electronics. Appx913-14. When asked if he witnessed the testing at all, he could only say was that "in all probability," "[p]robably," and "there is a high probability" that he witnessed some of the testing. Appx914. There is no probative evidence, that Mr. Bowen actually had any personal knowledge of Martin Electronics' production of the MK124 Signals. Indeed, if he did witness such testing, his evasiveness at the ASBCA hearing makes no sense as it would have strengthened the Government's case. Despite this, the ASBCA relied entirely on his testimony while disregarding positive testimony and documentary evidence that contradicts its decision. Appx15, Appx536, Appx1004.

By contrast, Mr. Long, whose testimony was completely disregarded, worked for six years with Martin Electronics and was very familiar with the Signal manufacturing and testing process. Appx536-537. Moreover, Mr. Long testified he had personal knowledge that Martin Electronics had manufacturing issues with leakers. Appx536. Critically, Mr. Long testified that Martin Electronics as part of its manufacturing process, "had to *preheat the outer container to somewhat soften it and kneel it before crimping to try to help with sealing the device to meet the leakage requirement*." Appx536 [Emphasis added]. Thus, Mr. Long explicitly described, based on his personal knowledge, that Martin Electronics added not one, but two,

extra steps not prescribed in the TDP to prevent leakers. These extra steps being that Martin Electronics (1) preheated the container and (2) "kneeled" the container. Appx536. These are just the additional steps that Martin Electronics implemented that Mr. Long was given the opportunity to testify about without the constant barrage of objections from the Government. There could be an untold number of other deviations that would have been revealed had Mr. Long been given the opportunity to testify fully.

Moreover, Martin Electronics sent a letter to the Government while it was producing the MK124 stating:

> Martin Electronic Inc. is very concerned with the recent results of lot acceptance testing under the reference contract. The reported failures of the first three MEI production lots has put the contract in serious delinquency and places the continued performance of the contract at significant risk. Currently, MEI has manufactured approximately 30% of the units required by the contract with o*nly about 4% accepted for delivery*. Through failure analysis conducted to date, *MEI is of the belief that all units manufactured have been done so in strict adherence with the [TDP]...*

Appx1004. [Emphasis added]. This letter is corroborated by the testimony of Mr. Bowen, the Government's witness. When Mr. Bowen was confronted with the letter quoted above, he testified, "I recall there were some issues early in this contract, how they were resolved I do not recall." Appx912. The only facts Mr. Bowen recalled about the Martin Electronics contract after 13 years is that it was completed, and Martin Electronics had problems producing the Signals at first. Appx912. The

fact that one of only two facts that Mr. Bowen recalls after 13 years suggests the difficulties in production were indeed very large.

The Government's principal witness admitted that Martin Electronics had substantial problems at the outset of production which were mysteriously solved. Of course, Mr. Long's admissible testimony resolves the issue, but it was ignored. Martin Electronics had difficulty producing the Signals at first because the TDP was inherently defective, which explains Martin Electronics' 4% success rate. Then, Martin Electronics deviated from the TDP in at least two respects which resolved the problems of the defective TDP.

Any success that Martin Electronics had in producing the MK124 Signals after its initial deficiencies may be attributed to the fact that Martin Electronics deviated from the defective TDP. These deviations were not disclosed to PSI when PSI took over the contract. As a result, Martin Electronics' performance is not proof that the TDP is functional. Instead, Martin Electronics' experience, beginning with a 4% success rate that only increased when they deviated from the TDP is solid proof that the TDP was inherently defective.

v)    *Conclusion*

For the foregoing reasons, this Court should find that the ASBCA's finding that the TDP was not defective and that PSI failed to demonstrate that it adhered to the TDP in the production of the Signals is not supported by substantial evidence.

The ASBCA relied primarily on the testimony of one witnesses who admitted to not have personal knowledge about much at issue and the ASBCA ignored substantial empirical evidence, case studies, and the testimony of multiple witnesses with personal knowledge that the TDP was followed strictly in the production of Lots 4-2 and 4-3. The ASBCA also ignored substantial evidence that the MK124 was impossible to produce by following the TDP. Indeed, when the Government's principal witness' testimony did not support the Government's position, the ASBCA gave that testimony no weight. This sort of selective reading of the record is not substantial evidence as contemplated by the law as analyzed by this Court. *JRS Mgmt. v. Lynch*, 621 F. App'x 978, 981 (Fed. Cir. 2015) (citing 41 U.S.C. § 7107(b)). As a result, the Court should remand this proceeding to the ASBCA to reconduct the evidentiary hearing, alternatively, there is sufficient evidence for this Court to order the conversion of the termination for default to one for convenience.

**B.    The ASBCA Erred by Not Allowing PSI to Present All of its Evidence of the Government's Bad Faith.**

Throughout the four-day hearing, the Government constantly objected to the presentation of any evidence of the Government's bad faith, especially evidence concerning the Government's general mistreatment of PSI, as evidenced by the Government's conduct in other contemporaneous contracts overseen by the same Government agents. Judge Page admitted some of the evidence of bad faith, but due to the distracting and misleading objections of the Government, a substantial amount

of evidence regarding bad faith was improperly excluded and stymied on the basis that it was not relevant, that it was hearsay, or that it was beyond scope of direct examination. Of course, the Government's many confusing, harassing, and repetitive objections were interposed against a *pro se* litigant. Nonetheless, an objective review of the record demonstrates that the excluded evidence was relevant, was definitionally non-hearsay, and was within the scope of direct examination. Reversal of these evidentiary rulings merits a new evidentiary hearing.

1. <u>The ASBCA improperly excluded Michael King's deposition testimony preventing the admission of substantial evidence of bad faith.</u>

The ASBCA excluded the deposition testimony of Michael King solely on the basis that it was not relevant. Appellee contends that the deposition testimony was excluded on the basis that Mr. King was not called as a witness. However, the Government's objection was purely as to relevance. Appx190. Moreover, the ASBCA's decision to exclude the deposition testimony was also based purely upon relevance stating, "unless you can give me direct *relevance* to the matters at issues here, then I will only allow you to examine Mr. Karlson with respect to background in context and I will not give this document any weight. I will sustain Mr. Neill's objection [as to relevance]." Appx190. And, "I'll sustain the Government's objection to Rule 4, Tab 281 as *lacking relevance* in this appeal." Appx191 [Emphasis added]. Thus, the sole basis for the exclusion was relevance.

The ASBCA has general discretion to introduce deposition testimony as evidence. R. 8(b)(2). However, the improper and legally erroneous objection as to relevance caused the ASBCA to fail to even consider admitting the evidence, preventing the ASBCA from properly analyzing the admissibility of the evidence.

The ASBCA, of course, later determined that the issue of fraud was relevant to the issue of bad faith. Appx81. That finding made Mr. King's deposition testimony relevant and thus improperly excluded; unfortunately, the ASBCA reached this conclusion months after the hearing had ended, by which time the Government had already succeeded in excluding PSI's evidence.

Moreover, despite Appellee's contention, Mr. King's deposition testimony is not hearsay, and Mr. King's presence at trial was not required to introduce his testimony. Mr. King was a Government representative and agent who dealt with the very contracts at issue. Thus, his out-of-court statements in the course of his work for the Government are attributed to the Government as an opposing party statement, which is definitionally non-hearsay. Fed. R. Evid. Rule 801(d)(2)(A). The general rules of hearsay that work to prevent the admission of deposition testimony apply to friendly witnesses and non-parties, not to the opposing party and its representatives. Indeed, deposition testimony made by an opposing party under oath should be afforded greater weight than an out of court statement made without an oath.

The exclusion of Mr. King's testimony was improper as it was both relevant and generally admissible as a party-opponent statement. This Court should find that the exclusion of this testimony requires that this proceeding be remanded for rehearing.

2.   The Hearing Transcript demonstrates that substantial evidence of bad faith was improperly excluded and that the Government intentionally harassed p*ro se* litigants to suppress legitimate lines of questioning.

Appellee contends that PSI "selectively quotes from the hearing transcript;" however, the quoted sections are clear illustrations both of the ASBCA's failure to admit probative evidence and of the Government's incessant bullying and erroneous objections designed to stifle the admission of probative evidence. Moreover, it is difficult to discern how PSI is selectively quoting the transcript when all of Appellee's quotations are fully included in PSI's larger quotations.

The first quote at Appx188 concerns the Government's objection to testimony of the Government's contemporaneous bad faith concerning a contract PSI held with the FBI. This testimony was never admitted because, when PSI attempted to provide background with Mr. King's testimony, the Government's objection to relevance was sustained. Appx188, Appx191. Evidence of the Government's contemporaneous bad faith and prior bad faith has some tendency to make it more probable that the Government was acting in bad faith in the execution of the instant

contract because it was the exact same Government agents involved throughout all of the contracts. Fed. R. Evid. Rule 401.

The second quote at Apx189-191 was excluded for the exact same reason. PSI attempted to introduce the deposition testimony of Mr. King, to which the Government objected citing relevance, which the ASBCA sustained. Again, the Government's agents' historic bad faith has some tendency to make it more probable that the Government's agents were again acting in bad faith and that these particular Government agents were biased against PSI. Fed. R. Evid. Rule 401.

The third quote at Appx227-229 illustrates one of the Government's speaking objections. The objection is longer than a full page of the transcript and intended to prevent testimony regarding the Government's bad faith. This objection was made with the purpose of stifling a chain of questioning by a *pro se* litigant, thus preventing the development of crucial testimony regarding the Government's bad faith in the execution of several contemporaneous contracts, which has some tendency to make it more probable that the Government was acting in bad faith in the instant contract. Fed. R. Evid. Rule 401.

Indeed, the Government's objections were so long, frequent, and oppressive that the ASBCA took a ten-minute recess to talk to the Government about its belligerent objections against the *pro se* litigants. Appx235. Despite this reprimand,

the Government immediately began objecting again after the ASBCA finished explaining the reason for its recess. Appx238.

The fourth quote at Appx238 is another example of PSI attempting to elicit testimony regarding bad faith, only to be, in the Government's words, "interrupt[ed]" again. Appx238. The Government's objection was based purely on relevance of the Government's bad faith. Appx238. This is an issue to which PSI had already responded multiple times. When asked for their response to the objection, PSI stated, "[w]e believe that we are entitled to fair and impartial Government inspectors and the premise [that] the QARS were operating in good faith is completely wrong. They're incapable of this. We are entitled to fair and impartial treatment." Appx238-239. This is not inadmissible character evidence as all the acts are ultimately part of one transaction where the same Government agents mistreated PSI across multiple contracts at the same time.

PSI articulated a full explanation of the relevance of the testimony as it relates directly to the bad faith of the Government and that it would demonstrate that PSI was treated unfairly. This testimony had some tendency to make it more probable that the Government was acting in bad faith in general and more specifically in the execution of the instant contract. Fed. R. Evid. Rule 401. The ASBCA incorrectly understood PSI's *pro se* response as a legal argument and stated that PSI needed to "lay the foundation to tie the events with respect to the FBI investigation and contract

to the matter before us" i.e. show its relevance. The PSI representative had already fully articulated the relevance of the testimony, and his frustrated statement that, "I have nothing further to say on that" was not a waiver of the prior proffer of evidence and articulation of the relevance of the excluded testimony. Appx239. The testimony was relevant to the Government's bad faith and inability or unwillingness to treat PSI impartially. PSI articulated this connection despite its *pro se* status. Yet, the ASBCA improperly sustained the objection as to relevance. Appx239.

The final quoted pages at Appx899-902 were also improperly ruled upon. Here, PSI attempted to elicit testimony from Ryan Pierce about his knowledge of the Government's prior false accusations of fraud against PSI. Appx900-02. The Government objected that this testimony was outside of the scope of the direct examination.

The direct examination concerned the basis on which Mr. Pierce terminated the contract. Whether a manufacturer was previously accused of fraud and whether a contracting officer was aware of this prior accusation and that it was false would certainly influence a contracting officer's willingness to believe that the manufacturer was "again" committing fraud. Thus, the testimony of Mr. Pierce's knowledge of the prior false accusations of fraud is directly admissible for the purpose of impeachment showing that his testimony that he did not consider fraud was not credible. Federal Rule of Evidence 611(b) clearly allows for the cross

24

examination of a witness regarding his own credibility. Thus, it was improper for the ASBCA to require PSI to narrow its questioning as it did at Appx900, and improper to exclude the entire narrowed line of questioning by sustaining the Government's objection challenging relevance and scope.

As stated in PSI's Opening Brief, the ASBCA slowly recognized its error in excluding evidence of bad faith, but did nothing to correct the prior errors. This Court should order a new evidentiary hearing to allow PSI the opportunity to present its case properly.

Appellee contends that the ASBCA ruled consistently throughout the hearing and that there is no evidence that the ASBCA would have admitted the earlier testimony with hindsight. As proof that the ASBCA did not change its rulings as to matters of bad faith, Appellee quotes the ASBCA stating,

> The contested questioning was not rejected because it dealt with bad faith *per se*, but because PSI failed to lay a proper foundation; demonstrate the relevance of the attempted examination; or establish that it was not eliciting unacceptable hearsay from a non-declarant.

Appx3141. This quotation in no way refutes PSI's contention that the ASBCA changed its rulings as the hearing proceeded to admit more evidence of the Government's bad faith. Indeed, the principal evidentiary dispute was whether the evidence of bad faith was relevant to the instant contract dispute.

Critically, this is one of the three basis that the ASBCA admits to controlling its rulings on the admissibility of the bad faith evidence. At the outset of the hearing,

the ASBCA did not comprehend the relevance of evidence concerning the Government's prior and contemporaneous conduct on other contracts to the bad faith claim regarding the instant contract. However, as the hearing proceeded, the ASBCA began to recognize that the bad faith evidence was relevant because it was evidence of these particular Government employees and the general mistreatment of PSI, and as a result, the ASBCA slowly began admitting some of this evidence.

Thus, not only did the ASBCA acknowledge that it initially didn't understand the relevance of the bad faith claims, but the record, as discussed above, corroborates that the ASBCA improperly excluded substantial evidence on the basis that it was not relevant because it related to the bad faith of the Government. At the outset of the hearing, the ASBCA repeatedly excluded testimony of the Government's historic and contemporaneous bad faith regarding other contracts because the ASBCA did not understand that it was the same Government officials operating throughout all of the contracts and that a general malaise covered the Government's overview of PSI infecting Government agents with a bias against PSI.

In short, the ASBCA excluded evidence of bad faith stating it was not relevant. The ASBCA later realized that it was relevant and considered the evidence on bad faith that had been presented, but found there was insufficient evidence of bad faith. That finding was the product of the ASBCA's decision to initially exclude the majority of the evidence. To correct these errors this Court should remand these

proceedings to the ASBCA for a new evidentiary hearing and allow PSI to present all its evidence.

3.    <u>Conclusion</u>

The ASBCA's inconsistent rulings and initial failures to understand the relevance of the Government's general bad faith resulted in the exclusion of a substantial amount of admissible, probative evidence that likely would have changed the ASBCA's ultimate decision. Appellee states that the ASBCA "admitted much of PSI's evidence after it established foundation and relevance regarding its bad faith allegations." Gov. Br. at 59. However, PSI was neither able to introduce the majority of its evidence, nor return and correct the record by eliciting more testimony regarding bad faith after the ASBCA realized its error in excluding this evidence. Indeed, the ASBCA's finding in its Order, recognizing the relevance of bad faith and finding that PSI was entitled to present the evidence, widened the field of admissible evidence. As a result, this Court should order a new evidentiary hearing so that PSI can put forth its evidence on these issues.

## XIV.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT

The ASBCA failed to correctly apply the law to the facts regarding whether the Government acted in bad faith, whether the Government was arbitrary and capricious in terminating the contract for default, and whether the TDP was defective. The ASBCA's decision is not supported by substantial evidence. Finally,

the ASBCA incorrectly excluded substantial evidence of the Government's bad faith. This Court should order a new hearing before the ASBCA at which PSI is allowed to fully present its evidence. Alternatively, sufficient grounds exist for this Court to reverse the decision of the ASBCA and convert the Government's termination from default to convenience.

Respectfully submitted, this 10th day of August, 2020.


_____
M. DEVLIN COOPER
Georgia Bar No. 142447
KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Appellant*

COOPER, BARTON, & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: 478.841.9007
Facsimile: 478.841.9002
mdc@cooperbarton.com
keb@cooperbarton.com

# I.    CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. Cir. R. 32(a) because it contains 6,476 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

Dated: This 10th day of August, 2020

$$\overline{\phantom{xxxxxxxxxxxxxxxxxxxx}}$$
M. DEVLIN COOPER
Georgia Bar No. 142447
KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Appellant*

COOPER, BARTON, & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: 478.841.9007
Facsimile: 478.841.9002
mdc@cooperbarton.com
keb@cooperbarton.com

## II.    CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing APPELLANT'S

REPLY BRIEF to the Clerk of Court using the CM/ECF system, which will

automatically send electronic mail notification of such filing to the following

CM/ECF participants:

Daniel S. Harzfeld, Esq.
United States Department of Justice
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, D.C. 20044
Daniel.s.herzfeld@usdoj.gov

This 10th day of August, 2020.

_____
M. DEVLIN COOPER
Georgia Bar No. 142447
KENNETH E. BARTON III
Georgia Bar No. 301171
*Counsel for Appellant*

COOPER, BARTON, & COOPER, LLP
170 College Street
Macon, Georgia 31201
Telephone: 478.841.9007
Facsimile: 478.841.9002
mdc@cooperbarton.com
keb@cooperbarton.com